STATE of Missouri, Respondent,

v.

Troy N. POLSON, Appellant.

No. WD 63189.

Missouri Court of Appeals,
Western District.

Oct. 12, 2004.

Ellen H. Flottman, Columbia, MO, for appellant.

Deborah Daniels, Assistant Attorney General, Jefferson City, MO, for respondent.

Before JAMES M. SMART, JR., Presiding Judge, JOSEPH M. ELLIS, Judge and LISA WHITE HARDWICK, Judge.

JOSEPH M. ELLIS, Judge.

Troy N. Polson was charged by information in lieu of indictment with one count of assault in the first degree, § 565.050 [1] (Count I); one count of armed criminal action, § 571.015 (Count II); one count of possession of a controlled substance (namely, methamphetamine) with intent to distribute, § 195.211 (Count III); one count of possession of a chemical (namely, pseudoephedrine) with intent to create a controlled substance (namely, methamphetamine), § 195.420 (Count IV); and one count of possession of a methamphetamine precursor drug (namely, pseudoephedrine) with intent to manufacture methamphetamine, § 195.246, RSMo Cum.Supp.2001 (Count V). A jury found Polson guilty as charged, and the circuit court sentenced him to fourteen years imprisonment on Count I, seventeen years on Count II, fourteen years on Count III, six years on Count IV, and four years on Count V. [2] He appeals not only his convictions, but his sentences. We affirm in part, vacate in part, and remand for resentencing with instructions.

The sufficiency of the evidence to support Polson's convictions is at issue in this appeal only as to his conviction for first-degree assault. Viewed in the light most favorable to the verdicts, the following evidence was adduced at trial.

In the first part of 2002, Polson resided with his cousin Johnny Tye in a two-bedroom apartment in Odessa, Missouri. Around February 2002, Troy Thompson (Polson's 17–year–old son by Lois Thompson) moved to Odessa to live with Polson and Tye. Tye's bedroom was located in the northeast corner of the apartment. Polson would typically sleep in the southeast bedroom of the apartment, but also often stayed in "the city" at the El Forsteros Motorcycle Club.

Thompson knew that Polson and Tye were engaged in the business of selling drugs from the apartment, having previously witnessed drug transactions take place there and having seen Polson weigh and package doses of powdered methamphetamine using plastic baggies and fake plastic shotgun shells at the apartment. Thompson had also heard Polson speak with Tye, Matthew Carrell, or their "meth cook" Mike Adams (whom he described as Polson's "business associates") about manufacturing methamphetamine and obtaining the chemical ingredients for making methamphetamine, such as over-the-counter antihistamines and "anhydrous." Thompson also testified that although he had never seen them make any methamphetamine in his presence, he had seen Polson and Adams grinding up pseudoephedrine pills in the apartment using an electric blender provided by Adams. He explained that they had to go to multiple retail outlets like Wal–Mart, Osco, and Quik Trip to obtain the pills because "if you can get a certain amount of them, like

---

1. Unless otherwise noted, all statutory references are to RSMo 2000.

2. Whether the sentences on Counts I–III and Counts IV–V were intended to run consecutively or concurrently is a subject of this appeal and is addressed later in this opinion.

too much, they get suspicious about it because there's a limit to them." On more than 100 occasions, Polson or Tye gave Thompson doses of powdered methamphetamine. Polson also provided acquaintances Amanda Mann and Sara Bowers with methamphetamine "a lot of times."

On the evening of March 17, 2002, Polson, Thompson, Tye, and Mann were sitting on an L-shaped couch in the living room of the apartment. All four of them had used methamphetamine provided by Polson for a few days prior to that night, and Thompson had been awake for a day or two on the high from the drug. While cleaning his fingernails with a sharp pocket knife, Polson was talking about his fear that he was going to be kicked out of the motorcycle club temporarily. When Thompson teased him about it, Polson became enraged, came at Thompson, and started stabbing at him with the knife. Polson stabbed at Thompson three times, inflicting two wounds—one to Thompson's right knee and one to his left forearm. The wound to Thompson's knee was about an inch deep and began bleeding badly, while the other wound was deep enough for Thompson to be able to see the tissue within his forearm. After stabbing Thompson, Polson yelled at him, "How dare you disrespect me like that," also admonishing him, "You know better than to talk about the club like that." Polson then told Thompson to "go clean up the blood" because he was bleeding through his pant leg onto the couch and the floor, and he went into the bathroom to tend to his wounds.

The next day, Polson told Thompson not to tell anyone about the stabbing "because he could get charged with attempted murder and get into serious trouble," but to tell anyone who asked about his wounds that he had fallen down and cut himself on some glass. Polson also disposed of Thompson's punctured and bloody jeans that day. Thompson missed the next two days of school due to the wound to his knee, as it was very painful for him to try to walk. He also limped for several weeks following the stabbing and experienced pain for about a month due to the knee wound. Thompson had visible scars from both wounds when he finally saw a doctor in May 2002, and still had a scar on his knee at the time of trial in June 2003.

On March 29, 2002, Thompson was playing pool at Double D's, a "beer bar" in Odessa. Bowers and Mann were also there and had been for several hours, and both had become "very intoxicated." Sometime between midnight and 1:30 a.m. on the morning of March 30, as the bar was closing, Thompson offered to let Bowers and Mann "crash" at the apartment for the night. The two women accepted Thompson's invitation, and Thompson drove them to the apartment. After arriving at the apartment, Thompson and Mann went to a nearby convenience store for cigarettes and food, which they brought back 10 to 15 minutes later, and the three ate in the living room. When they finished eating, the three joined Polson in his bedroom, where they all watched television. At one point, at approximately 2:00 or 2:30 a.m., Polson used a pocket knife to cut a line of powdered methamphetamine on a CD case for use by Mann, and she snorted the methamphetamine to help her sober up.

Eventually, Thompson and Mann went back into the living room to play strip poker, while Bowers and Polson stayed in the bedroom. At this time, Andrea McNew, another acquaintance of Polson's, was sitting on the couch in the living room doing a crossword puzzle. Soon thereafter, Carrell and his girlfriend Amy Smith arrived at the apartment in Tye's pickup truck. Carrell and Smith went straight to

Polson's bedroom, and Polson and Carrell started whispering to each other. After Smith went back into the living room, Polson and Carrell then went into the bathroom together and closed the door. Five minutes later, the two men came out of the bathroom, with Polson returning to his bedroom and Carrell going into the living room.

While Polson and the others were in the apartment, the Lafayette County Crisis Action Team, which was comprised of local law enforcement officials for the purpose of executing high-risk search warrants, had gathered at the local high school to prepare to execute a warrant to search the apartment for the person of Polson. Around 4:00 a.m. on the morning of March 30, which was about 15 minutes after Carrell and Smith arrived and very shortly after Polson and Carrell had left the bathroom, the officers executed the search warrant. First, they secured the people located in the living room. Derrick Morgan of the Lafayette County Crisis Action Team headed back to the bedrooms, including Polson's southeast bedroom. From his vantage point just outside that bedroom, Officer Morgan saw Bowers and Polson, whereupon Polson threw a plastic shotgun shell onto the top shelf of his closet. Morgan then entered the room, yelled, "Police, search warrant" and ordered Bowers and Polson to get down on the floor. The shotgun shell which Polson had thrown into the closet rolled off the top shelf and fell to the floor, where Morgan first saw it. From that point on, Polson suddenly went totally limp, refusing to respond to police commands, closing his eyes, and refusing to open them.

As soon as all of the people in the apartment were secured, including Tye, who had been sleeping in his bedroom, a search warrant for the entire apartment was obtained based on the suspected presence of drugs in plain view. The subsequent search of the apartment revealed various drugs and other items used to manufacture and distribute methamphetamine. In Tye's bedroom and closet, the police found several baggies containing a powdery substance, including one green baggie with "Playboy bunny type of decals" on it, several imitation shotgun shells, a piece of counter-surveillance equipment, a loaded pistol, and three loaded rifles. In Polson's bedroom, they found an imitation shotgun shell on the floor next to the closet (which was later found to contain a small bag of white powdery substance), another baggie in the closet containing a white powdery substance, a coffee filter with a yellowish stain on it, a piece of aluminum, paperwork concerning the El Forsteros Motorcycle Club, an El Forsteros hat and related clothing, a spiral notebook (one page of which contained a notation "Steve Cook, DEA, head of gang transport"), and several knives, at least one of which (a silver "Cane Cutter" knife) Bowers testified had been used by Polson "to chop up dope with." In the kitchen, police found another notebook containing information about drug enforcement agents, a plastic bag with residue in it, another fake shotgun shell (which was later determined to contain "green baggies with Playboy bunnies on" them), a set of digital electronic scales, and another piece of counter-surveillance equipment. On the floor by the couch in the living room, they found two unopened blister packs of Actifed pills and a plastic bag with residue. Other evidence found during the search included a baggie containing white powder in Carrell's pocket; two additional pieces of counter-surveillance equipment in a vehicle owned by Carrell and Smith; a blister pack of "pseudoephedrine or ephedrine-type pills," a coffee filter, and plasticware in Tye's pickup truck; and several "green baggies with

Playboy bunnies on them" containing a powdery substance in McNew's car.

Lab tests revealed that the powdery substances found in Tye's bedroom, Polson's bedroom, the kitchen, Carrell's pocket, and McNew's car all contained methamphetamine, weighing a total of over 13 grams. The coffee filter found in Polson's bedroom and the plastic bag found on the floor by the couch in the living room also contained methamphetamine residue. A forensic chemist confirmed that all three blister packs (the two found in the living room of the apartment and the one found in Tye's truck outside) contained Actifed pills, which contain pseudoephedrine, a precursor ingredient for producing methamphetamine. Thompson testified that the two packages of pills found on the floor in the living room of the apartment were not there to treat anyone's cold symptoms, but for "making meth." Likewise, he testified that the coffee filters found in the apartment were not used to make coffee, but to aid in the manufacture of methamphetamine.

Polson chose not to testify in his own defense. He called only one witness (Tye), who testified that while he and Polson were methamphetamine users, they were not involved in selling or making methamphetamine. Tye also testified that his only involvement with methamphetamine, other than using it, was to buy pills containing pseudoephedrine for Carrell and someone else, whom he refused to identify. On cross-examination and through a rebuttal witness, the State presented evidence that on the day of his arrest, Tye had previously made oral and written statements to police in which he admitted purchasing pseudoephedrine pills for Polson, Carrell, and Adams on numerous occasions, and that he had overheard Polson, Carrell, and Adams "talking about a lab coming up missing and that they were the only ones that knew where the lab was located, so they couldn't figure out what had happened to it."

At the close of the evidence, instructions, and arguments of counsel, the jury deliberated for only an hour and seventeen minutes before finding Polson guilty as originally charged on all five counts. He was later sentenced on all five convictions, and this appeal followed.

■ In his first point, Polson claims that the trial court erred in overruling his motion for a judgment of acquittal on Counts I and II at the close of all the evidence because the State presented insufficient evidence that he attempted to cause serious physical injury to Thompson. He contends that, "at most, [the] evidence shows a second degree assault in a fit of rage. It does not show the kind of specific intent required for first degree assault."

In assessing the sufficiency of the evidence, the appellate court " 'accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary.' " *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993) (quoting *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989)). It does not act as a "super juror" with veto powers, but gives great deference to the trier of fact. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). " '[T]he relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

Polson does not contend that the verdict director submitted by the State on Count I (the first-degree assault charge) was erro-

neous. This instruction, which was modeled after MAI–CR 3d 319.08 as modified by MAI–CR 3d 304.08, required the State to prove and the jury to find, beyond a reasonable doubt, that Polson "attempted to cause serious physical injury to Troy Thompson by stabbing him with a knife." The instruction further informed the jury that "a person attempts to cause serious physical injury when, with the purpose of causing that result, he does any act that is a substantial step toward causing that result." *See* § 564.011.1. Finally, the instruction made clear to the jury that "the term 'serious physical injury' means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." *See* § 565.002(6).

■ Here, the evidence was clearly sufficient to show that Polson acted with the purpose of causing serious physical injury to Thompson. " 'Intent, as an element of assault, is generally not susceptible of direct evidentiary proof and may be established by circumstantial evidence or inferred from surrounding facts.' " *State v. Hostetter*, 126 S.W.3d 831, 836 (Mo.App. W.D.2004) (quoting *State v. White*, 847 S.W.2d 929, 933 (Mo.App. E.D.1993)). "The relevant circumstances to be considered include [the defendant's] conduct before the act, the act itself, and [the defendant's] subsequent conduct." *Id.*

■ As "it will be presumed that a person intends the natural and probable consequences of his acts," *State v. O'Brien*, 857 S.W.2d 212, 218 (Mo. banc 1993), Polson's intent to cause serious physical injury to Thompson could properly have been inferred by the jury from the fact that Polson deliberately stabbed at Thompson multiple times with a weapon that is fully capable of inflicting such an injury. *See generally State v. White*, 798 S.W.2d 694, 697 (Mo. banc 1990). Moreover, the fact that Polson actually caused serious physical injury to Thompson[3] was also sufficient, in and of itself, to permit the jury to infer that he intended to cause such injury. "A jury can infer intent to cause physical bodily harm when 'under the circumstances, the prohibited result may reasonably be expected to follow from a voluntary act, irrespective of any subjective desire on the part of the offender to have accomplished the prohibited result.' " *State v. Franklin*, 854 S.W.2d 55, 58 (Mo.App. W.D.1993) (quoting *State v. Kincade*, 677 S.W.2d 361, 364 (Mo.App. E.D.1984)). Thus, the seriousness of the injury actually sustained by Thompson permits and supports an inference of Polson's purpose to cause serious physical injury to him. *State v. Broseman*, 947 S.W.2d 520, 524 (Mo.App. W.D.1997); *Franklin*, 854 S.W.2d at 58. Because Polson's voluntary act of stabbing Thompson in the knee actually resulted in serious physical injury to him, which injury was the natural and probable consequence of that action, the jury could reasonably have inferred that Polson acted with the purpose of causing that injury.

---

**3.** The wound to the Thompson's knee resulted in protracted impairment of the function of the knee, as Thompson had to miss two days of school because of the pain when he tried to walk, limped for several weeks, and felt pain for more than a month afterward. " 'Protracted' means something short of permanent but more than of short duration; what is considered protracted depends on the circumstances." *State v. Briggs*, 740 S.W.2d 399, 401 (Mo.App. E.D.1987). An injury that causes the lack of full use of a leg or foot, even for as brief a period of time as a week, is sufficient to constitute "protracted impairment" to satisfy the definition of "serious physical injury" for first-degree assault. *State v. Ross*, 939 S.W.2d 15, 18–19 (Mo.App. S.D. 1997). *See also State v. Pettit*, 976 S.W.2d 585, 592 (Mo.App. W.D.1998).

■ Furthermore, Polson's post-attack actions and statements comprised additional indirect evidence of his intent to cause serious physical injury. "A permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or [the] accused's role therein." *State v. Hibbert*, 14 S.W.3d 249, 253 (Mo.App. S.D.2000). The evidence at trial showed that Polson quickly disposed of Thompson's jeans, which were stained with blood and had holes from where Polson's knife had torn through them, and then told Thompson to lie about how his injuries had occurred. Even more tellingly, Polson told Thompson not to say anything about the assault "because he [Polson] could get charged with attempted murder and get into serious trouble." This statement showed not only Polson's desire to conceal the crime, but his recognition of the seriousness of the injury that he intended to inflict and had actually inflicted.

Accordingly, the State presented sufficient evidence for the jury to have concluded, beyond a reasonable doubt, that Polson stabbed Thompson with the purpose of causing him serious physical injury. Therefore, the trial court did not err in overruling his motions for a judgment of acquittal at the close of all the evidence on the first-degree assault and armed criminal action charges. Point denied.

■ In his second point, Polson claims the trial court erred in admitting State's Exhibit 46, a collection of green baggies containing methamphetamine found outside the apartment in the parked vehicle of Andrea McNew, one of the people present at the time the police entered the residence. He contends that his convictions on Counts III–V must be reversed since this evidence was logically irrelevant in

that it had no probative value and was also legally irrelevant in that its prejudicial impact outweighed its probative value.

Evidence must be both logically and legally relevant in order to be admissible. Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case. Evidence is legally relevant if its probative value outweighs its costs—prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or cumulativeness.

*State v. Barriner*, 111 S.W.3d 396, 400–01 (Mo. banc 2003) (internal quotation marks and citations omitted). "A trial court enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal." *State v. Mayes*, 63 S.W.3d 615, 629 (Mo. banc 2001). "An abuse of discretion will not be found unless the trial court's decision in admitting the challenged evidence 'is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration.'" *State v. Scurlock*, 998 S.W.2d 578, 587 (Mo.App. W.D.1999) (quoting *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991)).

In this case, narcotics agent Donald Barker testified that, while he was searching the apartment, he found a green plastic bag on the headboard of Tye's bed containing a powdery substance. The baggie had "little bunnies" on it, resembling the "Playboy bunny kind of decals." Other green baggies with Playboy bunny decals on them were found hidden in a fake

shotgun shell located in a toolbox in the kitchen. Barker testified that vehicles parked outside the apartment at the time of Polson's arrest were also searched. This included a vehicle belonging to Andrea McNew, who was in the apartment when the police entered. After Polson's relevance objection was overruled, Barker testified that State's Exhibit 46, a container with green baggies inside, featuring the same Playboy bunny design as found in the apartment, was found inside McNew's car. The contents of all these green baggies tested positive for methamphetamine.

The trial court did not abuse its discretion in admitting State's Exhibit 46 because it was both logically and legally relevant. Before Polson could be convicted on Count III (possession of a controlled substance with intent to distribute), the applicable verdict director required the State to prove that, aware of its presence and nature, Polson intended to distribute, deliver, or sell to another person the methamphetamine constructively and jointly possessed by him. The fact that McNew had methamphetamine in her car packaged in the same distinctive green baggies with Playboy bunny decals that were found in the kitchen of Polson's apartment and in Tye's bedroom made the existence of a fact that was of consequence to the determination of the action (namely, Polson's intent to distribute the methamphetamine he possessed at the time of his arrest) more probable than it would have been without the evidence. The evidence was, therefore, logically relevant to the issue of intent.

Nor did the trial court abuse its discretion in determining that State's Exhibit 46 was also legally relevant in that its probative value outweighed its costs. The challenged testimony was quite brief and was not repetitive of any other evidence in the case, so undue delay, waste of time, and cumulativeness were not factors. Moreover, we can find nothing in the record indicating that the evidence misled or confused the jury, or resulted in undue prejudice to Polson. Indeed, without identifying anything in particular, Polson argues only that the "risk of confusion and prejudice was too great." That argument is far too amorphous and evidentially unsupported to establish even an abuse of discretion, much less reversible error. Point denied.

■ In his third point, Polson argues that the trial court plainly erred in convicting and sentencing him on both Counts IV and V because this violated his federal constitutional right to be free from double jeopardy in that the class D felony charged in Count V was a lesser included offense of the class C felony charged in Count IV.

■ Because he did not specifically raise this argument at trial, Polson concedes that the error alleged in his third point was not properly preserved for appellate review. Thus, he requests review for plain error under Rule 30.20, the pertinent part of which provides that "[w]hether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

Rule 30.20 permits, but does not require, us to review for plain error substantially affecting the rights of a defendant, which resulted in a manifest injustice or miscarriage of justice. More than a mere showing of demonstrable prejudice is required. Rather, prejudice exists, under the 'plain error' rule, only where the error complained of impacts so substantially upon the rights of a defendant that manifest injustice or a miscarriage of justice will result if left uncorrected. The burden of proving manifest injustice or miscarriage of justice is on the defendant.

*State v. Seibert*, 103 S.W.3d 295, 298 (Mo. App. S.D.2003) (internal citations omitted). As this court recently explained in *State v. Hagan*, 113 S.W.3d 260 (Mo.App. W.D. 2003), plain error review is a two-step process:

> Step one involves examining whether the allegation of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. In effect, an appellate court must determine whether, on the face of the claim, 'plain error' has, in fact, occurred. Absent that determination, this court should decline to exercise its discretion to review a claim for plain error. Once plain error is found, step two of the process authorizes the appellate court, in its discretion, to determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.

*Id.* at 267 (internal citations, brackets, and quotation marks omitted).

Citing several cases for the general proposition that a defendant must raise constitutional double jeopardy issues at the earliest opportunity, the State urges us to refuse to review Polson's point, even for plain error. However, as made clear by the Missouri Supreme Court's recent decision in *State v. Couts*, 133 S.W.3d 52 (Mo. banc 2004), despite the fact that " '[t]he rule is clearly established that in order to preserve a constitutional issue for appellate review, it must be raised at the earliest time consistent with good pleading and orderly procedure and must be kept alive during the course of the proceedings,' " an appellant who has "admittedly failed to raise his double jeopardy claim until his appeal" may nevertheless request (and receive, at the reviewing court's discretion) plain error review of a claim that a particular conviction and sentence were imposed in violation of the appellant's Fifth Amend-

ment protection against double jeopardy. *Id.* at 54 (quoting *State v. Wickizer*, 583 S.W.2d 519, 523 (Mo. banc 1979)).

In the case *sub judice*, we will exercise our discretion to review Polson's unpreserved double jeopardy claim as it facially establishes substantial grounds for believing that plain error occurred. In so doing, we are mindful that "[t]he 'plain error' rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review." *State v. Tokar*, 918 S.W.2d 753, 769 (Mo. banc 1996). Moreover, we acknowledge that relief under the plain error standard is to be granted only when there is has been a strong, clear demonstration that a defendant's rights have been so substantially affected that a manifest injustice or miscarriage of justice inexorably results if left uncorrected. *State v. Hyman*, 11 S.W.3d 838, 842 (Mo.App. W.D.2000). However, as will be seen, and in light of the fact that "[p]lain error 'is error that is evident, obvious and clear,' " *State v. Thurston*, 104 S.W.3d 839, 841 (Mo.App. S.D.2003) (quoting *State v. White*, 92 S.W.3d 183, 189 (Mo.App. W.D. 2002)), under the circumstances presented by this case we are firmly convinced that it is appropriate to grant discretionary plain error review of Polson's double jeopardy claim.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." This protection is made applicable to state governments by virtue of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct.

2056, 23 L.Ed.2d 707 (1969).[4] "Beyond simply protecting defendants from successive prosecutions for the same offense after an acquittal or a conviction, the Fifth Amendment also prohibits multiple punishment for the same offense." *Hagan v. State*, 836 S.W.2d 459, 462 (Mo. banc 1992).

> The protections afforded are distinct. In contrast to the double jeopardy protection against multiple trials, the final component of double jeopardy—protection against cumulative punishments—is designed to ensure that the sentencing discretion of the courts is confined to the limits established by the legislature. Double jeopardy analysis regarding multiple punishments is, therefore, limited to determining whether cumulative punishments were intended by the legislature. Where the legislature has specifically authorized cumulative punishment under two statutes proscribing the same conduct, the trial court or the jury may impose cumulative punishment under such statutes in a single trial without offending against the double jeopardy clause.

*McTush*, 827 S.W.2d at 186 (internal quotation marks and citations omitted). Accordingly, "legislative intent regarding multiple punishments for the same offense controls the question of whether double jeopardy protection is available." *Id.* at 188. Since this "inquiry turns upon determination of whether the legislature intended to provide cumulative sentences for the same conduct," we must first examine the

statutes under which Polson was convicted. *Id.* at 187.

Review of the statutes under which Polson was convicted on Counts IV and V (§§ 195.420 and 195.246, respectively) shows that they are silent on the question of whether the legislature intended to punish the prohibited conduct cumulatively. Consequently, "recourse must be made to Missouri's general cumulative punishment statute," which is § 556.041. *State v. Villa–Perez*, 835 S.W.2d 897, 903 (Mo. banc 1992), *abrogation on other grounds recognized by State v. Bigsby*, 891 S.W.2d 160 (Mo.App. S.D.1995). Section 556.041 provides:

> When the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if
>
> (1) One offense is included in the other, as defined in § 556.046; or
>
> (2) Inconsistent findings of fact are required to establish the commission of the offenses; or
>
> (3) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct; or
>
> (4) The offense is defined as a continuing course of conduct and the person's course of conduct was uninter-

---

**4.** Article I, Section 19 of the Missouri Constitution provides that no person shall "be put again in jeopardy of life or liberty for the same offense, after being once acquitted by a jury[.]" Since Polson was never acquitted by a jury, the Double Jeopardy Clause of the Missouri Constitution does not apply to his case. *State v. McTush*, 827 S.W.2d 184, 186 (Mo. banc 1992). However, Polson's protection from double jeopardy under Missouri law is coextensive with that afforded by the Fifth Amendment. As pointed out in *State v. Richardson*, 460 S.W.2d 537, 538 (Mo. banc 1970), *abrogated on other grounds by McTush*, 827 S.W.2d at 188–89, Missouri enforces the common law rule that no person shall, for the same offense, be twice put in jeopardy: "We find no readily discernible difference between the Fifth Amendment guarantee against double jeopardy and the common law guarantee as applied in this State."

rupted, unless the law provides that specific periods of such conduct constitute separate offenses.

Although it is clear that the exceptions contained in subsections (1) and (3) are both potentially applicable here, it is only necessary for us to consider § 556.041(1). Under the terms of § 556.046.1, an offense is an included offense of a charged offense within the context of 556.041(1) when:

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It is specifically denominated by statute as a lesser degree of the offense charged; or

(3) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein.

§ 556.046.1; see also Villa–Perez, 835 S.W.2d at 903. Of the three subsections of § 556.046.1, only subsection (1) applies here. Under § 556.046.1(1), the reviewing court "focuses on the statutory elements of the offenses rather than upon the evidence actually adduced at trial." McTush, 827 S.W.2d at 188.

Application of § 556.046.1(1) is straightforward. The elements of each offense are gleaned from the statutes or common law definitions and then compared. If each offense is established by proof of an element not required by the other offense, then neither offense is an included offense within the meaning of § 556.046.1(1), and the limitation on con-

victions for multiple offenses codified at § 556.041(1) does not apply.

Id. (internal citations omitted). Conversely, however, if one offense is an included offense within the meaning of § 556.046.1(1), the limitation on convictions for multiple offenses codified at § 556.041(1) applies. State v. McLemore, 782 S.W.2d 127, 128 (Mo.App. E.D.1989).

Section 195.420, the statutory basis for Count IV, provides:

1. It is unlawful for any person to possess chemicals listed in subsection 2 of section 195.400,[5] or reagents, or solvents, or any other chemicals proven to be precursor ingredients of methamphetamine or amphetamine, as established by expert testimony pursuant to subsection 3 of this section, with the intent to manufacture, compound, convert, produce, process, prepare, test, or otherwise alter that chemical to create a controlled substance or a controlled substance analogue in violation of sections 195.005 to 195.425.[6]

2. A person who violates this section is guilty of a class C felony.

3. The state may present expert testimony to provide a prima facie case that any chemical, whether or not listed in subsection 2 of section 195.400, is an immediate precursor ingredient for producing methamphetamine or amphetamine.

Section 195.246, RSMo Cum.Supp.2001, the statutory basis for Count V, provides:

---

5. Among the many different chemicals listed in § 195.400.2 are "Ephedrine, its salts, optical isomers, and salts of optical isomers" (§ 195.400.2(17)); "Pseudoephedrine, its salts, optical isomers, and salts of optical isomers" (§ 195.400.2(20)); and "Phenylpropanolamine, its salts, optical isomers, and salts of optical isomers" (§ 195.400.2(19)).

6. Amphetamine and methamphetamine are both controlled substances or controlled substance analogues whose creation is prohibited except as authorized by §§ 195.005 to 195.425. See § 195.211.1.

1. It is unlawful for any person to possess any methamphetamine precursor drug with the intent to manufacture amphetamine, methamphetamine or any of their analogs.[7]

2. Possession of more than twenty-four grams of any methamphetamine precursor drug or combination of methamphetamine precursor drugs shall be prima facie evidence of intent to violate this section. This subsection shall not apply to any practitioner or to any product possessed in the course of a legitimate business.

3. A person who violates this section is guilty of a class D felony.

A careful reading of the two statutes, as well as the chemicals listed in § 195.400.2 and the definition of "methamphetamine precursor drug" in § 195.010(25), makes it readily apparent that § 195.246 is a lesser included offense of § 195.420, because a conviction under § 195.246 is established by proof of the same or less than all the facts required to establish a conviction under § 195.420. To put it another way, while one can violate § 195.420 without violating § 195.246, it is impossible to violate § 195.246 without *also* violating § 195.420. *See State v. Amsden,* 299 S.W.2d 498, 504 (Mo.1957). Since the exception contained in § 556.041(1) applies, cumulative punishments under § 195.420 (as charged in Count IV) and § 195.246 (as charged in Count V) are not permitted. As a consequence, Polson is entitled to federal double jeopardy protection and, under the plain terms of § 556.041, "may not ... be convicted of more than one" of those offenses.

In its brief, the State does not even address Polson's claim that § 195.246 is a lesser included offense of § 195.420. Instead, the State argues that there was no double jeopardy violation because it presented sufficient evidence at trial to establish what it claims were two *separate and distinct* instances of possession of pseudoephedrine with the intent to manufacture methamphetamine on the part of Polson—in particular, his constructive joint possession of (1) the two blister packs of Actifed found on the floor by the couch in the living room; and (2) the blister pack of Actifed found in Tye's truck. "Because there was pseudoephedrine found in two different places," the State reasons, "the evidence supported two different charges of possession of that pseudoephedrine" with intent to manufacture methamphetamine—one under § 195.420, and one under § 195.246.[8]

The State's contention is devoid of merit. To begin with, it is entirely inconsistent with the position taken by the State while being questioned by the trial court, *sua sponte,* at a hearing on Polson's motion for a new trial, which was conducted on August 4, 2003. During that hearing, the following exchange took place between the trial court, the prosecutor (Mr. Bellamy), and the defense attorney (Mr. Fraser):

---

7. Section 195.010(25), RSMo Cum.Supp. 2001, defines the phrase "methamphetamine precursor drug" as used in §§ 195.005 to 195.425 as "any drug containing ephedrine, pseudoephedrine, phenylpropanolamine, or any of their salts, optical isomers, or salts of optical isomers[.]"

8. The State's argument implicitly assumes that, as applied to the case at bar, the allowable unit of prosecution for the possessory offenses defined in §§ 195.420 and 195.246 is a single opened or unopened blister pack of pills containing pseudoephedrine. However, the State cites no authority to support the validity of that assumption. *See generally State v. Nichols,* 865 S.W.2d 435, 437 (Mo. App. E.D.1993).

THE COURT: Mr. Bellamy, address for me the distinctions, if any, between counts IV and V on the possession of a chemical with intent to create a controlled substance, and the next count, guilty of possession of a methamphetamine precursor drug with the intent to manufacture methamphetamine. As I recall the evidence there were blister packs of ephedrine or something of that nature found in the apartment itself, but those two counts sound awfully similar and how is, how are those two counts distinguished?

MR. BELLAMY: *As far as the evidence, the same evidence is used to demonstrate the guilt on both counts, it is the same pseudoephedrine that is the basis for each of those particular counts.* It is the legislature that has created two distinct charges, one of possession of a chemical with intent to manufacture. And they list pseudoephedrine as certainly one of those chemicals. Also the other count, which is a different classification of felony of possession of precursors. This is defined also within that as a precursor. As far as distinguishing the two, I can only advise the court that the legislature has created two separate and distinct offenses for that type of conduct. But they do, in fact, have different elements within those particular offenses and charges, even though the same elements and the same chemicals are used to establish both. So, I can only advise the court that they must've intended to create two separate charges because they are distinct charges, one a class C felony and one a class D felony. *But, it is the same pseudoephedrine in this case.*

THE COURT: The same evidence can support two different charges because [the two] different charges have different statutory elements and the State has to produce evidence on each element in each count, and the jury then had to find those elements beyond a reasonable doubt, that's what you're saying?

MR. BELLAMY: That is correct.

\* \* \*

MR. FRASER: I don't believe that, this is basically the same charge with possession of pills with two different results of it. Same action, same evidence, not any, no different action and no different evidence other than what the pills were. They're the same pills, so they've nailed him twice on the same pills.

Shortly thereafter, the trial court denied Polson's motion for a new trial, granted allocution, and imposed sentence. The highlighted portions of this exchange clearly demonstrate that the State's current position on appeal with regard to the evidentiary basis for the convictions on Counts IV and V is diametrically opposed to that which it advanced just before allocution and imposition of sentence. While this could be a sufficient ground upon which to summarily reject the State's newfound theory,[9] it certainly does not, to say the least, enhance the State's argumentative credibility on appeal.

On the other hand, defense counsel's response did (albeit indirectly) identify the issue squarely before us now—and that is whether the State's proof of the fact that the three blister packs of Actifed were found in two different physical locations was legally sufficient to sustain Polson's convictions on Counts IV and V.

9. *See State v. Winfield,* 5 S.W.3d 505, 515 (Mo. banc 1999) (noting, in a somewhat similar context, that when a trial court's resolution of a particular evidentiary issue is based on a party's representations at trial, that party "is bound by the arguments made and the issues raised at trial and may not raise new and totally different arguments on appeal.")

The State cites no applicable authority whatsoever in support of its argument that the constructive joint possession, by a single defendant, of multiple quantities of the same precursor chemical is legally sufficient to sustain separate convictions under §§ 195.420 and 195.246. The one and only case cited by the State in its brief is *State v. Baker*, 103 S.W.3d 711 (Mo. banc 2003). In *Baker*, the appellant alleged that the trial court erred in allowing the State to submit its second amended information because it failed to properly charge appellant with a violation of § 195.420. *Id.* at 721. That information "charged [the defendant] with knowingly possessing 'methanol or hydrogen peroxide or lighter fluid or naphtha or muriatic acid or pseudoephedrine or ephedrine or acetone and other solvents proven to be precursor ingredients of methamphetamine' with the intent to create methamphetamine." *Id.* Although "the evidence at trial established unequivocally that each of the chemicals was found in appellant's residence," *id.* at 723, the appellant argued that because the second amended information listed the various precursor substances in the disjunctive form, it failed to sufficiently charge him with a violation of § 195.420. *Id.* at 721. The Missouri Supreme Court then noted that "[t]he state concedes that it should not have charged possession of each chemical disjunctively in a single count, as possession of any one of the listed chemicals, by itself, is a separate and distinct offense under section 195.420." *Id.* The Court went on to hold that "appellant did not suffer any prejudice, because the faulty information simply could not have hindered his defense," since "even if the information had listed the precursors in the appropriate conjunctive form, appellant would have had to prepare the exact same defense." *Id.* at 722.

As Polson was neither charged nor proven to have been in constructive joint possession of more than one distinct precursor chemical and has not challenged the sufficiency of the five-Count information under which he was charged, we are hard-pressed to see how *Baker* is of any assistance to the State. It certainly does not hold, as suggested by the State, that proof of a defendant's possession of multiple quantities of one of the listed precursor chemicals, whether found in the same physical location or not, is sufficient to support separate convictions under §§ 195.420 and 195.246.

■■■ From a jurisprudential standpoint, we are particularly hesitant to adopt the position urged by the State. First of all, it would permit the State to achieve one of the very things the Fifth Amendment was designed to prevent. As explained in *State ex rel. Westfall v. Campbell*, 637 S.W.2d 94 (Mo.App. E.D.1982):

> Under the double jeopardy doctrine, the state cannot split a single crime and prosecute it in separate parts; otherwise the state could prosecute a defendant as many times as there are parts into which an offense is susceptible of being divided. This means that a prosecution for any single part of a crime bars any further prosecution based upon the whole or another part of that crime. Double jeopardy forbids the state from a piecemeal prosecution of an offense.

*Id.* at 97 (internal citations omitted).

Second, it would necessarily permit separate felony convictions under either or both statutes for each and every individual blister pack of Actifed possessed by a defendant as long as they were found in different physical locations. In the absence of statutory language or Missouri case law authorizing such a result, we cannot presume this was intended by the legislature and also think that "no legitimate purpose of the criminal laws would be

served by the construction that the state favors." *Id.* at 98.

■ For these reasons, and because "[w]here a party fails to support a contention with relevant authority or argument beyond conclusions, the point is considered abandoned," *Beatty v. State Tax Comm'n*, 912 S.W.2d 492, 498–99 (Mo. banc 1995), we have little choice but to reject the State's argument.

It was a manifest injustice for the trial court to have convicted and sentenced Polson under both § 195.420 (as charged in Count IV) and § 195.246 (as charged in Count V), since this violated the Double Jeopardy Clause. It remains only for us to determine the appropriate remedy. The trial court sentenced Polson to six years on Count IV, and four years on Count V. Since the trial court also ordered the sentences on Counts IV and V to run concurrent with each other, "we can cure the violation by ordering that the shorter of the [two] sentences be vacated." *State v. Elliott*, 987 S.W.2d 418, 422 (Mo.App. W.D.1999); *see also Reed v. State*, 778 S.W.2d 313, 320 (Mo.App. W.D.1989). We, therefore, vacate Polson's conviction and sentence on Count V.

■ In his fourth and final point, Polson claims the trial court plainly erred in entering the sentences it did because those sentences, as pronounced both orally and in writing, violated his rights to due process of law under the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Missouri Constitution in that they were "completely contradictory and [left] the Department of Corrections with unlimited discretion as to how much time [he] must serve."

■ Because Polson did not object to any of his sentences during or after allocution (or, indeed, at any other time prior to appeal), the error alleged in this point was not properly preserved for appellate review. Thus, he once again requests review for plain error under Rule 30.20. As it facially establishes substantial grounds for believing that plain error occurred, we will exercise our discretion to review Polson's unpreserved claim of sentencing error.

The circuit court orally sentenced Polson as follows:

With respect to Count I the Court sentences and commits the defendant to the custody of the Missouri Department of Corrections for a period of 14 years, to be served consecutive with the sentences about to be imposed in Counts II and III, *but concurrent with* the sentences about to be imposed on Counts IV and V.

With respect to Count II the Court sentences and commits the defendant to the custody of the Missouri Department of Corrections for a period of 17 years to be served consecutive with Counts I and III, *but concurrent with* Counts IV and V.

With respect [to] Count III the Court sentences and commits the defendant. to the custody of the Missouri Department of Corrections for a period of 14 years to be served consecutive with Counts I and II, *and concurrent with* Counts IV and V.

With respect to Count IV the Court sentences and commits the defendant to the custody of the Missouri Department of Corrections for a period of 6 years, to be served concurrent with the sentence about to be imposed in Count V, *but consecutive to* Counts I, II, and III.

With respect to Count V the Court sentences and commits the defendant to the custody of the Missouri Department of Corrections for a period of 4 years to be served concurrent with the sentence imposed on Count IV *and consecutive with*

the sentences imposed on Counts I, II, and III.[10]

(Emphasis added.) Polson argues that this group of sentences "is internally contradictory and makes no sense as written or pronounced." The State concurs, noting that "[a]ccording to the sentences for Counts 1–3, the sentences for Counts 4 and 5 were to run concurrently to Count 1–3, but according to the sentences for Counts 4 and 5, those sentences were to run consecutive to Counts 1–3. Therefore, the pronouncement of whether Counts 4 and 5 are to run concurrently or consecutive to Counts 1–3 is inconsistent, and resentencing is required for the trial court to clarify whether they are concurrent or consecutive."

We agree with the parties and hold that a manifest injustice or miscarriage of justice would result if the sentences were left uncorrected since they are in fact internally contradictory and would indeed allow the Department of Corrections to arbitrarily determine the ultimate length of Polson's prison term. Accordingly, the cause is remanded to the trial court for resentencing on Count IV with instructions to determine whether the six-year sentence on that Count is to be served consecutive to or concurrent with the consecutive sentences on Counts I–III. *See State v. Olney,* 954 S.W.2d 698, 701 & n. 2 (Mo. App. W.D.1997).

To summarize, Polson's convictions and consecutive sentences on Counts I, II, and III are affirmed. His conviction and sentence on Count V are vacated, and the cause is remanded to the trial court for resentencing on Count IV with instructions to determine whether the six-year sentence on Count IV is to be served consecutive to or concurrent with the consecutive sentences on Counts I–III.

All concur.

---

**10.** The document containing the court's written judgments and sentences is worded similarly.