

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD86820 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | |
| SHANE A. DUNCAN, | ) | June 24, 2025 |
| | ) | |
| Appellant. | ) | |
| | ) | |

**Appeal from the Circuit Court of Johnson County, Missouri
Honorable Stacey Lett, Judge**

**Before Division Four: Anthony Rex Gabbert, Chief Judge Presiding,
Lisa White Hardwick, Judge, and Janet Sutton, Judge**

Shane Duncan (Duncan) was found guilty by a jury of three counts of abuse of a child, in violation of section 568.060, and one count of second-degree domestic assault in violation of section 565.073[1] for injuries he inflicted on his two-month-old son, Victim. Duncan appeals, arguing that the trial court committed plain error by failing to sua sponte find a double jeopardy violation for his convictions for two of the abuse of a child charges. The trial court's judgment is affirmed.

---

[1] All statutory references are to RSMo (2016).

## Factual and Procedural Background

In July 2023, Duncan was indicted on three counts of abuse or neglect of a child, counts I–III, and one count of second-degree domestic assault, count IV. The abuse or neglect counts covered a date range of seven days between January 16, 2023, and January 22, 2023. The State alleged in count I that Duncan struck Victim in the back and inflicted serious physical injury. In count II, the State alleged that Duncan pulled, twisted, or shook Victim's legs, causing serious physical injury. Count III alleged Victim suffered physical injury when Duncan knowingly neglected Victim when he failed to seek proper medical attention. Finally, the State alleged in count IV, the second-degree domestic assault count, that on January 22, 2023, Duncan caused physical injury to Victim by striking him.

Duncan does not contest the sufficiency of the evidence to support his convictions. The evidence at trial, viewed in the light most favorable to the verdict, showed the following:

Duncan and his wife, M.S. (Wife) had a child, Victim, born in November 2022. Victim spent the first two weeks of his life in the hospital. He came home, only to return for another two weeks in the hospital. He was released sometime in January. On January 14, 2023, Victim had a routine medical follow-up where he had no injuries and was healthy, other than not gaining weight.

In late January 2023, when Victim was around two months old, it was routine for Duncan to watch Victim while Wife worked every day for four to five hours. Victim spent one night with Wife's mother. Otherwise, Victim was solely in the care of Duncan and/or Wife. On January 22, after Victim had been irritable for a few days, Duncan and Wife took Victim to the hospital because Victim was vomiting, did not want to be held, was acting like "something was

hurting," and was "very, very fussy." Doctors initially found blisters from a large burn covering the entire top of Victim's mouth, a skull fracture, and a broken arm.

After being informed of this, Wife asked Duncan what was going on, and Duncan did not tell Wife anything. A hospital social worker then told Duncan and Mother that doctors found that Victim had additional injuries including rib, spine, and leg fractures. When informed about Victim's injuries, Duncan said the burn in Victim's mouth might have been caused by him microwaving Victim's formula. Regarding Victim's arm fracture, Duncan wondered if he had "swaddled" Victim "too tightly." Duncan commented that Victim's skull fracture might have been caused by Duncan dropping his phone twice on Victim's head. Regarding Victim's other injuries, Duncan turned to Wife, stated this "was not an accident," and he "wondered aloud" whether Wife's mother "could have done this."

Duncan and Wife then went for a walk during which Duncan told Wife that he had fallen on Victim. Duncan did not say that Victim stopped breathing because of the fall or that he performed CPR on Victim. When Duncan and Wife told hospital staff about the fall, the staff asked Duncan follow-up questions. Duncan said that four or five nights before bringing Victim to the hospital, he had been walking with Victim in the middle of the night, that it was dark, and he tripped and fell on Victim. Duncan did not say that Victim stopped breathing or that he tried to perform CPR.

A physician in the hospital's SCAN Clinic, a clinic that sees children who have suffered possible abuse or neglect, testified that several diagnostic tests were run on Victim, including head CTs, a skeletal survey (head-to-toe x-rays), and "bleeding labs." The tests revealed Victim's additional injuries. Victim had a "parietal skull fracture," on the right side of his head that was likely caused by blunt force trauma to Victim's head. The fracture had swelling around

3

it, indicating it was an acute injury, meaning that it had occurred no more than a week before. Accidentally dropping a cell phone on Victim's head would not cause enough force to cause the skull fracture.

Victim also had a subconjunctival hemorrhage (bleeding) in the white part of his eye, which would have also been likely caused by blunt force trauma. Wife reported that she noticed the bleeding the day before Victim was brought to the hospital.

Victim had seven posterior rib fractures; five on the right side of his body and two on the left side. These posterior rib fractures would have been caused by a "compression force," like "a violent squeezing" or some other "violent impact" to Victim's back area, near his ribs. There was no new bone formation, and the doctor testified that Victim's rib fractures had occurred seven to ten days earlier. Force applied to the front of the chest would not have caused the posterior rib fractures.

Victim also had six "compression" vertebrae fractures, and he had an area of blood around his spinal cord. The fractures were on the spine in the upper and middle thoracic region, and on the lower spine in the lumbar region. The doctor opined that these injuries could have been caused by Victim being slammed down hard on his bottom or by violent hyperextension, which would occur by being "violently flung back." These were acute injuries that had occurred within the past week or so. Pushing on Victim's chest, such as during CPR, would not have caused the fractures in his back.

Victim had a displaced radius fracture in his right forearm that was caused by a "violent [] bending force or other blunt kind of trauma." "Excessive force" would have been required to cause such a break in a baby because a baby's bones are "actually very strong," and a break such

4

as this would have been "obvious" when it occurred. This fracture had also occurred within the past seven to ten days. Swaddling a baby too tightly would not have caused such a fracture.

Finally, Victim had multiple classic metaphyseal lesions, also called corner fractures or bucket handle fractures, in his right shin bone near the ankle, in the same shin bone by the knee, and in his right thigh bone by the knee. Victim had the same type of fractures in the shin and thigh bone on the left side by his knee. The doctor testified that these fractures are highly indicative of child physical abuse, explaining that, "these are unique fractures that are caused by a violent yanking or pulling on the bone," and it would have been apparent when they occurred because a baby would cry from the pain. The doctor believed that the fractures also occurred within seven to ten days of the hospital visit. These fractures were inconsistent with a crushing or fall fracture or being swaddled "incorrectly."

The SCAN Clinic doctor testified that there was not "one thing" that could have caused all of Victim's injuries, and the injuries required different types of impacts such as squeezing, yanking, hitting, and slamming. The doctor concluded that Victim's injuries were not accidental and were the result of child physical abuse.

The internet search history on Duncan's phone showed a visit on January 16 to www.purplecrying.info, a website with tips on dealing with frustration and anger. During a jail call to his mother, Duncan claimed he was "ninety-five percent" sure he knew how Victim was injured. Duncan claimed that a few days before Victim was taken to the emergency room, he fell on Victim. Duncan's mother told him that the fall was not what caused Victim's injuries. Duncan said that he wanted to tell her the truth. Duncan claimed that he performed chest compressions, squeezed on Victim's sides, pulled on Victim's legs, and stated that he may have patted Victim on the back "harder than [he] should have" and that he "slammed" Victim into his

chest "a little too hard." Duncan told his mother that he did not think Wife's mother caused Victim's injuries.

After his arrest, Duncan messaged Wife and his mother using a jail-provided tablet and HomeWAV, a program for inmates to communicate. In a HomeWAV conversation with his mother, Duncan asked her to call Wife about the "PoliceStationPlan." In a conversation with Wife, Duncan told her to call his mother because his mother had a plan. The plan was for Wife to go to the police station and for her to change her statement to point the finger at Wife's mother to get Duncan released sooner. Duncan messaged Wife, "hopefully it doesn't go to trial. If u tell them truth bout me and tell them bout your mom, it won't go to trial." Wife told Duncan that she did not believe her mother could have caused Victim's injuries and that Victim was acting "fussy" before staying with her mother.

Wife testified and denied that she did anything to injure Victim. Duncan did not testify at trial. The jury found Duncan guilty on all counts as charged. The trial court sentenced Duncan to ten years' imprisonment on each of the three counts of abuse of a child, to run consecutively, and five years' imprisonment on the second-degree domestic assault count, to run concurrently.

Duncan appeals.

**Legal Analysis**

In his sole point on appeal, Duncan argues the trial court plainly erred in entering convictions on two of the abuse of a child counts, because the convictions and sentences were duplicative and violated his right to be free from double jeopardy. Duncan argues that the State failed to prove beyond a reasonable doubt that Victim's injuries were not inflicted as a result of a single, continuous, and uninterrupted incident and it did not prove that he formed a new intent.

6

Duncan failed to preserve his double jeopardy claim in the trial court and he requests plain error review under Rule 30.20. Our review for plain error is discretionary. *State v. Onyejiaka*, 671 S.W.3d 796, 798 (Mo. banc 2023). We will not exercise our discretion to review for plain error "unless the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Id.* (quoting *State v. Brandolese*, 601 S.W.3d 519, 526 (Mo. banc 2020)).

Generally, double jeopardy claims, like other constitutional claims, must be raised at the earliest chance and preserved at each step of the proceedings. *Id*.; *State v. Liberty*, 370 S.W.3d 537, 546 (Mo. banc 2012). However, an unpreserved double jeopardy claim is entitled to plain error review if the alleged double jeopardy violation is determinable from the face of the record. *Onyejiaka*, 671 S.W.3d at 798. This is because "[t]he right to be free from double jeopardy is a constitutional right that goes to the very power of the State to bring the defendant in the court to answer the charge brought against him." *State v. Neher*, 213 S.W.3d 44, 48 (Mo. banc 2007).

> Plain error review is a two-step process. The threshold issue in plain error review is whether the circuit court's error was facially evident, obvious, and clear. If the appellant establishes a facially evident, obvious, and clear error, then this Court will consider whether the error resulted in a manifest injustice or miscarriage of justice.

*State v. Battle*, 685 S.W.3d 47, 49 (Mo. App. E.D. 2024) (internal quotation marks and citations omitted).

The double jeopardy clause of the Fifth Amendment to the United States Constitution guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V.[2] The double jeopardy clause protects defendants from

---

[2] The Fourteenth Amendment's Due Process Clause makes this amendment applicable to the states. *State v. Polson*, 145 S.W.3d 881, 891-92 (Mo. App. W.D. 2004) (citing *Benton v. Maryland,* 395 U.S. 784, 794 (1969)).

multiple prosecutions for the same offense after an acquittal or a conviction, as well as prohibiting multiple punishments for the same offense. *Onyejiaka*, 671 S.W.3d at 798; *State v. Heathcock*, 708 S.W.3d 163, 166-67 (Mo. banc 2025). "Because double jeopardy is an affirmative defense, it is the defendant's burden to prove that double jeopardy applies." *Heathcock*, 708 S.W.3d at 166 (quoting *State v. Mullenix*, 73 S.W.3d 32, 34 (Mo. App. W.D. 2002)).

The State may not split a single crime and prosecute it in separate parts under the double jeopardy clause. *State v. Polson*, 145 S.W.3d 881, 896 (Mo. App. W.D. 2004). "Double jeopardy does not attach, however, when a defendant is punished for more than one offense arising from the same set of facts, even if the offenses are multiple violations of the same statute." *State v. Wadsworth*, 203 S.W.3d 825, 833 (Mo. App. S.D. 2006). "Missouri courts have found separate offenses where 'the conduct is dissimilar or the actions are separated in time.'" *State v. Clark*, 494 S.W.3d 8, 13 (Mo. App. E.D. 2016) (quoting *State v. Barber*, 37 S.W.3d 400, 404 (Mo. App. E.D. 2001)).

"Where the counts are based on different acts or a separate *mens rea* is formed for each act, crimes are different in nature." *Id.* *See also Heathcock*, 708 S.W.3d at 166 (stating that when "the charges are based on different acts or a separate *mens rea* is newly formed, the conduct gives rise to an additional crime"). A defendant, therefore, may be convicted of multiple counts of the same offense if the charges are based on different conduct or if the defendant forms a separate *mens rea*. *See Heathcock*, 708 S.W.3d at 167; *State v. Torres*, 626 S.W.3d 316, 324 (Mo. App. W.D. 2021); *State v. Brandon*, 523 S.W.3d 476, 481 (Mo. App. E.D. 2016). Put simply, the crimes are separate if "the defendant has the opportunity to reconsider his actions." *Clark*, 494 S.W.3d at 13.

For example, in "an assault case, separate offenses can arise from a single set of facts each time the defendant forms an intent to attack the victim." *State v. Harris*, 243 S.W.3d 508, 511 (Mo. App. W.D. 2008) (quoting *State v. Tyler*, 196 S.W.3d 638, 641 (Mo. App. W.D. 2006)). "If the defendant has an opportunity to reconsider his actions, each assault separated by time is considered a separate offense." *Id*. *See also State v. Muldrew*, 629 S.W.3d 99, 105 (Mo. App. E.D. 2021) (holding no double jeopardy violation where a defendant was convicted of first-degree assault and first-degree murder involving the same victim when the defendant had at least fifteen minutes between the acts for him to reconsider his actions); *Clark*, 494 S.W.3d at 12-14 (holding no double jeopardy violation for convictions of two counts of first-degree robbery based on a defendant robbing the same victim twice during a five-hour car ride and where the defendant did not point to any evidence tending to show that the two robberies occurred in the same instance or within minutes instead of hours of one another); *Tyler*, 196 S.W.3d at 641-42 (holding no double jeopardy violation where a defendant's five assault convictions based on five different forms of violence occurring in several distinct phases, and the record showed a "renewed intent to inflict injury by committing sequential acts of" assault).

Here, as to count I, the trial court instructed the jury that Duncan committed abuse of a child if it found that on or between January 16 and January 22, 2023, Duncan knowingly caused serious physical injury to Victim as the result of abuse by "striking [Victim] in the back." For count II, the jury was instructed that Duncan committed abuse of a child if it found that on or between January 16 and January 22, 2023, Duncan knowingly caused serious physical injury to Victim as the result of abuse by "pulling, [sic] [Victim's] legs." We find no double jeopardy violation determinable from the face of the record, and, therefore, Duncan fails to make a threshold showing that plain error review is warranted.

9

The record establishes that Duncan, in both law and fact, committed separate offenses. Duncan's convictions for two counts of abuse of a child for both striking Victim on the back and pulling Victim's legs did not violate his right to be free from double jeopardy. Victim's injuries in counts I and II occurred during a seven-day window and resulted from Duncan using different methods of force. Victim's posterior rib fractures and vertebrae fractures were likely caused by Duncan inflicting two different forces: a "compression force," like "a violent squeezing," and a violent "slamming down," or some other violent impact to Victim's back side. Victim's leg fractures were caused by Duncan violently yanking or pulling on Victim's bones. Each of Duncan's acts that caused Victim's injuries involved a different method of abuse with a different type of force. This necessarily gave Duncan time to reflect upon his conduct and re-establish his intent to abuse Victim, thereby allowing a new *mens rea* to form. Consequently, Duncan was not subjected to double jeopardy for these two convictions of child abuse. *See Schofield v. State*, 750 S.W.2d 463, 466 (Mo. App. W.D. 1988) (holding no double jeopardy violation for three separate assault convictions when a defendant stabbed victim with a knife, beat victim with a piece of wood, and strangled victim with a nylon strap during ongoing attack because the defendant used "three distinct acts of force, committed by three separate methods and inflicted by three separate weapons").

Duncan cites *State v. Harris*, 243 S.W.3d 508 (Mo. App. W.D. 2008), and *State v. Garnett*, 298 S.W.3d 919 (Mo. App. E.D. 2009), to support his argument, but both are readily distinguishable from this case. In *Harris*, the defendant was convicted of three counts of assault for stabbing the victim in the back, arm, and face. 243 S.W.3d at 510. On appeal, the defendant contended his assault convictions and sentences punished him multiple times for the same offense and improperly exposed him to double jeopardy. *Id.* We reversed, noting that the

10

State's evidence "clearly reflect[ed]" that the entire altercation lasted a little more than one minute and that the defendant and the victim "were locked in a single, continuous battle the entire time." *Id.* at 511-12. We held that the record did not contain any evidence supporting an inference that the victim and the defendant stopped struggling for any period of time giving the defendant an opportunity to reconsider his actions. *Id.* at 511. Without this evidence, the defendant's attack on the victim must be considered as one assault and not three, and the defendant's right to be free from double jeopardy was violated when he was convicted and sentenced in three separate counts for the same offense. *Id.* at 511-12.

In *Garnett*, the defendant was convicted of separate assault counts for cutting the victim's throat, breast, and leg. 298 S.W.3d at 923. On appeal, the defendant argued that all of the victim's injuries were inflicted as part of a single assault, and to charge him with separate acts of assault subjected him to multiple convictions and punishments in violation of his right to be free from double jeopardy. *Id.* at 922. The Eastern District reversed the defendant's convictions. *Id.* at 924. The Court stated that the evidence "indicated the victim's injuries were inflicted in one quick[] continuing attack," and the record contained no evidence supporting an inference that the defendant and the victim stopped struggling for any amount of time to give the defendant the opportunity to reconsider his actions. *Id.* Without "evidence of separation of time sufficient to provide [the] [d]efendant an opportunity to reconsider his action," the defendant's attack on the victim was one assault and not three as charged by the State. *Id.*

Here*,* unlike *Harris* and *Garnett*, the record does not clearly reflect that Duncan caused Victim's injuries in a single, continuous incident. Duncan argues that the State did not meet its burden to produce evidence regarding the separation in time of Victim's injuries or that this was more than one continuous event. This argument, however, turns the burden of proof in this case

on its head. We have already said that, as an affirmative defense, it is Duncan's burden to establish a double jeopardy violation, not the State's burden to disprove that one occurred. *See State v. Ollerich*, 678 S.W.3d 147, 150 (Mo. App. S.D. 2023); *Heathcock*, 708 S.W.3d at 166. Further, even if we consider Duncan's self-serving hearsay statements he made to his mother that this was an accident, the record still does not clearly reflect that Victim's rib, vertebrae, and leg fractures occurred at the same time. Duncan failed to raise the issue before the trial court and present any evidence to prove a double jeopardy violation, thereby denying the State the ability below to present its own evidence to rebut Duncan's double jeopardy claim.

Regardless, there is no double jeopardy violation apparent from the face of the record, and, therefore, Duncan's claim of error does not facially establish substantial grounds for believing that manifest injustice has resulted from his convictions of the two counts of abuse of a child.

Duncan's sole point on appeal is denied.

## Conclusion

The trial court's judgment is affirmed.

_____
Janet Sutton, Judge

Anthony Rex Gabbert, C.J., and Lisa White Hardwick, J. concur.