STATE of Missouri, Plaintiff–Respondent

v.

Donal R. WADSWORTH, II, Defendant–Appellant.

No. 27388.

Missouri Court of Appeals, Southern District, Division One.

Oct. 30, 2006.

**8.** All references to statutes are to RSMo 2000,     unless otherwise indicated.

Duane A. Cooper, Evenson, Carlin & Cooper, LLC, Pineville, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Asst. Atty. Gen., Jefferson City, for respondent.

JOHN E. PARRISH, Judge.

Donal R. Wadsworth, II (defendant) was convicted following a jury trial of seven counts of attempted enticement of a child.[1] §§ 566.151[2] and 564.011. This court affirms.

Jim Murray works as a detective with the Diamond, Missouri, police department. He concentrates on conducting investigations "[p]atrolling on the internet looking for illegal activity." In March 2004, Detective Murray posted a profile for a 13–year–old girl in a "chat room." He explained, "I go into chat rooms as a 13–year–old girl." The identifying name he gave the persona he created was "Cindy 64840." He posted a picture of a 13–year-old girl in a short skirt as "Cindy."

Detective Murray was contacted in his capacity as Cindy on March 27, 2004, by defendant. Detective Murray explained, "This was an instant messenger which was just between me and him, and at no time did we ever engage in conversation in a chat room. It was simply instant messages due to the fact that he had asked me to add him to my instant messenger."[3] Defendant's request to be added to Cindy's instant messenger list identified him as "Sun Shadow Hero." Cindy added Sun Shadow Hero to her instant messenger list.

On March 27, 2004, Cindy "approached [defendant] by way of the instant messenger."[4] Cindy, in response to Sun Shadow Hero's inquiry, told him she was 13; that she would be 14 in September. He answered that he was "way older"; that he was 44.

Defendant asked Cindy whether she talked with her friends about men. She told him "[t]hat a neighbor guy had come by and rubbed lotion on her while she was sunbathing." That was followed by Cindy telling defendant a sexual story about an encounter between her and a neighbor in which she was molested. Other conversation about what occurred included defendant telling Cindy about his sexual partners, including that "15 is the youngest." The conversation ended with Cindy telling defendant that her mom called and said they needed to go to Neosho.

### March 29, 2004—Count I of the Amended Information

Defendant and Cindy conducted a conversation by instant messenger on March 29, 2004. It concluded at 10:07 p.m. During the communication, Cindy stated that she looked forward to seeing defendant. The following dialogue occurred:

sun_shadow_hero: i hope so
sun_shadow_hero: how will we?
sun_shadow_hero: mall? walmart?

---

1. Defendant was charged with nine counts of attempted enticement of a child. The trial court granted a motion to acquit defendant at the close of all the evidence as to Counts V and IX. The motion was denied as to the other counts with which defendant was charged.

2. References to statutes are to RSMo 2000.

3. Detective Murray explained that an instant messenger conversation "is live time conversation that is done on the monitor by way of telephone lines. The difference between a telephone call and that is just one is oral and the other is written."

4. Detective Murray explained that he knew Sun Shadow Hero was "visible." He told the court and jury, "In the 'list of friends' they are called on my instant messenger list, if they are online, the name will be bold. If they are not online, they will not be bold print." "Visible" meant that Sun Shadow Hero was online.

cindy64840: well, i could ask mom to spend the weekend with some friends.

cindy64680: i do that a lot . . . . .

cindy64680: and instead, meet you

sun_shadow_hero: hehe

The message continued with defendant asking Cindy what she would tell anyone who saw her with him and whether she was scared to meet a stranger. They talked about possibly meeting in Joplin. She said she would tell them he was her uncle; that she didn't know a lot of people in Joplin. She asked him if he would want to show her how to have sex. He responded, "[A] movie first." The discussion continued. Defendant explained in detail how they could perform oral sex with one another. After Cindy said her mother had told her to go to bed, he asked about what she was wearing; if she was wearing a bra and her bra size. When she told him she was "not nearly as big as some of the girls at school," he replied, "[B]ut i like small ones." At the end of the message defendant told Cindy, "[G]oodnight sweetie."

### April 3, 2004—Count II of the Amended Information

Defendant sent messages to Cindy on March 31, April 1, and April 3, 2004. The morning of April 3 they had an instant messenger exchange that ended at 11:42 a.m. They discussed classes defendant was taking. Cindy asked about them. He told her he could buy her things like t-shirts or a bikini. They discussed Cindy modeling a bikini for him if she had one. Defendant then asked Cindy about the incident she had told him about previously when a neighbor had put lotion on her. Cindy told him about the neighbor rubbing her, exposing her "boobs." She told of his reaching into her shorts. Defendant replied, "[T]hat makes me hard to think about it." Defendant talked to Cindy about "swimming without clothes on"; "maybe with you."

Defendant talked about how to have oral sex; that he likes to "shoot it in the girl's mouth" and "make her swallow it." He asked if she was "ready fo rit [sic]." She asked what else they could do. He answered, "[I] would love to lick youthere [sic]." He told her that he could get into trouble because she was underage. Cindy told defendant her mother told her lunch was ready. Cindy asked if defendant would "be on later." He told her he might not be but to "message" him. He terminated the message with "byeee sweeite [sic]."

### April 4, 2004—Count III of the Amended Information

Defendant sent messages to Cindy on April 4. He told her he "just missed" her "last night"; that he "was on at 8 and then came back at 11"; that he would be "back on here after 8:30." Later that evening defendant and Cindy had another instant message discussion. He asked her if he would have seen her outside her house if he had driven by. He asked if her house was easy to find. She answered, "[Y]es." He told Cindy he wanted to meet her sometime, "just not sure when or where."

Defendant talked to Cindy about her experience with the neighbor. He said the neighbor "was lucky" and that the thought of doing what the neighbor did excited him. Defendant described what sexual intercourse with her would be like and how he would fondle her breasts. He told her she "sound[ed] ready." Cindy told defendant her mother had "just said to get into bed." Defendant told her, "[G]o to bed and think of me." The message ended at 10:39 p.m.

*April 6, 2004—Count IV of the*
*Amended Information*

Defendant sent two messages to Cindy on April 5 and one on April 6 and participated in an instant messaging session April 6. Defendant told Cindy he "missed [her] last night." She answered that she babysat for friends of her mother. Defendant asked if she needed help babysitting, and Cindy asked if he would want to help. Defendant replied that "the kids may be neglected." Defendant asked if Cindy would like to sit on his lap. He told her it would be exciting, and then described what he would do. He told her what would occur if he put his hands up her shirt and asked where he could meet her.

They discussed a location where they might meet on the weekend. Defendant told Cindy he knew she wanted to be on his lap. Cindy asked what defendant would do then. He replied that it depended on whether they had clothes on, telling her "sitting on laps, naked ... a lot of things can happen." He described in detail what he could do.

After more exchanges, Cindy told defendant she had been told to go to bed. Defendant then asked again about what the neighbor Cindy had told him about had done. Cindy answered saying she "need[ed] to scat." Defendant told Cindy he would be on the computer the next day. The communication ended at 10:18 p.m.

*April 8, 2004—Count VI of the*
*Amended Information*

Cindy and defendant had an instant messaging session on April 8. He told her he was not sure if they could see each other on Friday. He suggested they talk on the phone first or maybe see her at the mall or Wal–Mart. He told her he would like to see her but she was young and he could get in a lot of trouble. He explained that "sometimes people get on here,,, [sic]

and try to trick people." He said he needed to be comfortable. Defendant told Cindy he could teach her things. She answered that he already had. He then talked about what he would do to the "certain spot" where Cindy had told him the neighbor had rubbed her; that "it makes a girl go crazy."

Defendant asked about where Cindy lived, if it was "close to the carver [sic] place." She described the location and the mobile home where she said she lived. Defendant then gave an address and telephone number and asked if that was it. She asked how he knew. He told her he looked it up on a telephone directory on the internet. He asked when he could call on Saturday. He told her he liked her and would "love to show [her] things." The communication ended at 10:36 p.m. Defendant told Cindy, "[D]ream of me."

*April 18, 2004—Count VII of the*
*Amended Information*

Cindy and defendant had another instant messaging meeting April 18. Defendant told Cindy he had been in the Joplin mall that afternoon. He told her that he had bought a necklace. When she said she thought maybe he had a girlfriend, he answered, "[N]ooooooo [sic]." He told her he was single and asked if she liked that. Cindy answered, "[Y]esssss [sic]." Defendant then told Cindy that he had seen the highway exit that led to where he understood her house was. He asked what a boy Cindy knew had done with her. She said they had kissed. He replied that he was jealous. Defendant then told her to imagine being "French kissed" and being touched sexually, describing it as "double penetration." He told Cindy she would moan into his mouth. Defendant again asked where Cindy lived and asked what would happen if he came to her house when everyone was in bed. He then told

her of sexual things for her to think about and said that was what he wanted to do.

### April 24, 2004—Count VIII of the Amended Information

Defendant and Cindy continued their e-mail and instant message communications. Defendant sent a message to Cindy on April 19. They exchanged e-mails April 21, 22, 23 and 24. On April 24 they participated in another instant message communication. Defendant told Cindy he would love to see her. They discussed the proximity of the Carver memorial to Cindy's house. Defendant told her he knew where the Carver memorial was. Defendant said it might work to meet there; that Cindy would not have far to walk. They discussed how defendant had driven by her house but had not seen her. Cindy told defendant she had been outside and a white van had driven by slowly. Cindy told defendant she had waved; that she thought it was him. He told her he drove a green SUV. Cindy said she must have gone inside a few minutes before defendant had driven by.

On April 25 Cindy e-mailed defendant and said she would meet him at the Carver Monument between 6:30 and 7:00 p.m. the following day. That evening Cindy and defendant had another instant message discussion. Defendant told her he wanted to meet her just to say "hi." Cindy told him she looked forward to seeing him the next day. Defendant answered, "ok."

### Investigation and Arrest

On the afternoon of April 24, 2004, Detective Murray watched the residence he had represented to defendant as being where Cindy lived. He watched it from his residence, across the highway from the one he had described to defendant. Detective Murray had learned defendant's identity and the kind of vehicle he drove.

He saw defendant drive by the residence. Detective Murray described what he observed when he first saw defendant's vehicle.

It was—came in from the west, was going east, and then it turned south on Carver Road, which is approximately 60, 70 yards away from the trailer [where Cindy had been represented as living], or maybe 80 or 90, but he went south on Carver Road, and turned around, came back up to Highway V, crossed Highway V, went north on Carver Road, turned around, came back to V Highway, and then he went east on V Highway, and he went right by in front of the trailer.

As soon as defendant had passed, Detective Murray got in his vehicle and followed defendant into Diamond, Missouri. He saw defendant buy gas.

Detective Murray had his next contact with defendant "[a]bout 6:45" April 26 at Carver memorial site. He was asked the nature of the contact. Detective Murray answered, "Newton County deputies were set up in the park itself as well as across the road, and the police chief and I were set up behind the Newton County deputies across the road waiting for [defendant] to arrive."

Defendant's vehicle turned into Carver Park. Law enforcement personnel followed him. Defendant was approached and taken into custody. Detective Murray told defendant it was a good thing they caught him before Cindy's father; that the father was extremely upset. He told defendant what the father might have done. Defendant answered that he understood; that he had a daughter himself.

### Defendant's Appeal

Defendant's first point on appeal argues that "[t]he trial court erred in the application of the law by failing to find that

double jeopardy prohibited [defendant's] second prosecution for multiple counts of attempted enticement of a child, since the [defendant's] numerous internet communications led to only one planned meeting." Defendant contends "the state's charges amounted to multiplicity, improperly split a single crime for prosecution of its component parts, and were collaterally barred by the final determination of multiple counts at [defendant's] first trial in 2004, all of which gives rise to an implied acquittal as to the whole."

The state filed its initial information in this case June 3, 2004, charging eleven counts of attempted enticement of a child. Trial began November 3, 2004, on the offenses charged by that information. At the conclusion of the evidence on November 4, 2004, the trial court dismissed Count IX. The remaining counts were submitted to the jury. The jury returned a verdict of not guilty as to Count I, a charge alleged to have occurred March 27, 2004, and announced that it was deadlocked on the remaining charges. The trial court declared mistrial on the counts on which the jury deadlocked.

The state filed a nine-count amended information September 21, 2005, on the charges in which mistrial was declared at the conclusion of the first trial. Trial on the offenses charged by the amended information began September 29, 2005. The trial court sustained defendant's motion for acquittal at the close of the state's evidence as to two counts. The trial court overruled the motion as to the remaining counts. The case was submitted to the jury at the close of the evidence. The jury found defendant guilty on each of the seven counts that were submitted. Defendant was sentenced to confinement for consecutive one-year terms for Counts VII and VIII and fined $5,000 each for Counts I, II, III, IV and VI.

■■■ Defendant contends that prosecution for attempted enticement of a child in seven separate counts violates the constitutional guarantee against double jeopardy. He argues that the acts alleged in the separate counts were but one offense. He claims that the various internet communications resulted in improperly splitting one offense in that the communications resulted in only one planned meeting; that because he was acquitted on one count in the first trial, the second trial resulted in him being placed twice in jeopardy for the same offense.

Protections against double jeopardy arise from the Fifth Amendment to the United States Constitution, which provides: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." This provision, pursuant to the Fourteenth Amendment, prohibits states from imposing multiple punishments for the same offense. *Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Although it generally does not allow the splitting of a single crime into separate parts for piecemeal prosecution, the double jeopardy clause is not violated when a defendant is punished for more than one offense arising from the same set of facts. *State v. Murphy,* 989 S.W.2d 637, 639 (Mo.App.1999). *State v. Tyler,* 196 S.W.3d 638, 641 (Mo. App.2006).

Section 566.151 provides:

1. A person at least twenty-one years of age or older commits the crime of enticement of a child if that person persuades, solicits, coaxes, entices, or lures whether by words, actions or through communication via the Internet or any electronic communication, any person who is less than fifteen years of age for the purpose of engaging in sexual conduct with a child.

2. It is not an affirmative defense to a prosecution for a violation of this section that the other person was a peace officer masquerading as a minor.

3. Attempting to entice a child is a class D felony.

. . .

Section 564.011.1 and .2 states:

1. A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A **"substantial step"** is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

2. It is no defense to a prosecution under this section that the offense attempted was, under the actual attendant circumstances, factually or legally impossible of commission, if such offense could have been committed had the attendant circumstances been as the actor believed them to be.

The charge of which the jury found defendant not guilty at the first trial was Count I of the information filed June 3, 2004. It alleged that defendant committed the offense of attempted enticement of a child on or about March 27, 2004, by soliciting sexual contact "via the internet" with a person defendant believed was less than 15 years old. The seven charges of which defendant was found guilty at the second trial were attempted enticement of a child on or about March 29, 2004 (Count I of the amended information), attempted enticement of a child on or about April 3, 2004 (Count II of the amended information), attempted enticement of a child on or about April 4, 2004 (Count III of the amended information), attempted enticement of a child on or about April 6, 2004 (Count IV of the amended information), attempted enticement of a child on or about April 8, 2004 (Count VI of the amended information), attempted enticement of a child on or about April 18, 2004 (Count VII of the amended information) and attempted enticement of a child on or about April 24, 2004 (Count VIII of the amended information).

Defendant's allegation of error in Point I is three-fold. First, he argues that his convictions cannot stand because they were the product of double jeopardy in that they led to only one planned meeting. Second, he says the charges were a multiplicity of but a single offense; that the charges "improperly split a single crime for prosecution of its component parts." Third, that his acquittal at the first trial amounted to "an implied acquittal as to the whole" and, thereby, "collaterally barred" a final determination of multiple counts.

Defendant was found guilty of seven counts of attempting to entice a child. A person is guilty of an attempt to commit an offense when "he does any act which is a substantial step towards the commission of the offense." § 564.011.1. The success of efforts to entice by effecting a meeting with a person defendant believed to be less than 15 years old was not required in order for defendant to be guilty of having attempted a liaison with that person for purposes of engaging in sexual conduct. One might argue a meeting would be required in order to convict a person of enticing a child. That is an issue to be determined another day in that defendant was not charged with enticing a victim. He was charged with attempting to entice a person he believed to be less than 15 years old for purposes of engaging in sexual conduct. Effecting a meeting was not an element of the offenses of which defendant was found guilty. The only requirements were that defendant's purpose was to commit the underlying of-

fense and that defendant took a substantial step toward its commission. *State v. Bates,* 70 S.W.3d 532, 535 (Mo.App.2002). A substantial step is an act strongly corroborative of the defendant's purpose to complete commission of the offense. *State v. Young,* 139 S.W.3d 194, 196 (Mo.App. 2004).

■■■ Double jeopardy occurs if a single crime is split into separate offenses for piecemeal prosecution. *See State v. Tyler, supra.* Double jeopardy does not attach, however, when a defendant is punished for more than one offense arising from the same set of facts, even if the offenses are multiple violations of the same statute. *Id. See, e.g., State v. Foster,* 838 S.W.2d 60, 66–67 (Mo.App.), *cert. denied,* 507 U.S. 994, 113 S.Ct. 1607, 123 L.Ed.2d 169 (1992).

Here, defendant had a number of communications with "Cindy" between the dates of March 27, 2004, and April 24, 2004. They led to defendant's convictions for the seven offenses. On March 29, defendant discussed places he could meet Cindy suggesting a mall or Wal–Mart. When Cindy said she could ask to spend the weekend with a friend but meet defendant, he replied "hehe." He talked about possibly meeting in Joplin, asking what she would tell anyone she knew if they saw him with her. Defendant then explained in detail how he and Cindy could have oral sex after initially suggesting "a movie first." There was sufficient evidence, and reasonable inferences from the evidence, from which a jury could find beyond a reasonable doubt that on March 27, 2004, defendant's purpose in communicating with Cindy was to entice her, believing her to be less than 15 years old, to meet him for purposes of engaging in sexual conduct, and that his communication was a substantial step toward commission of that offense.

On April 3, 2004, after sending Cindy messages March 31 and April 1, defendant told Cindy he could buy her things like t-shirts or a bikini; that she could model the bikini for him. He talked to Cindy about swimming without clothes on, "maybe with you." He again graphically discussed sexual activity with her and told her he could get in trouble because she was underage. There was sufficient evidence, and reasonable inferences from that evidence, from which a jury could find beyond a reasonable doubt that on March 31, 2004, defendant's purpose in communicating with Cindy was to entice her, believing her to be less than 15 years old, to meet him for purposes of engaging in sexual conduct, and that his communication was a substantial step toward commission of that offense.

On April 4, 2004, defendant asked Cindy if he would have seen her outside her house if he had driven by and asked if her house was easy to find. He told her he wanted to meet her sometime and described what sexual intercourse with her would be like. The evidence the jury heard and saw, and the reasonable inferences from that evidence, was sufficient for the jury to find beyond a reasonable doubt that on April 4, 2004, defendant's purpose in communicating with Cindy was to entice her, believing her to be less than 15 years old, to meet him for purposes of engaging in sexual conduct, and that his communication was a substantial step toward commission of that offense.

Defendant's instant message communication on April 6 told Cindy he had "missed her" the night before. She replied that she had been babysitting. Defendant asked about helping her babysit but suggested that if he helped, "the kids may be neglected." He communicated with Cindy about her sitting on his lap and stated different sexual activities he could

do with her. Defendant asked where he could meet her. The evidence, and reasonable inferences that could be derived from the evidence, was sufficient for a jury to find beyond a reasonable doubt that on April 6, 2004, defendant's purpose in communicating with Cindy was to entice her, believing her to be less than 15 years old, to meet him to engage in sexual conduct, and that the communication was a substantial step toward commission of that offense.

The instant messaging between defendant and Cindy on April 8 discussed whether they could meet the next Friday. Defendant suggested talking on the phone or meeting her at Wal–Mart. His discussion again turned to sexual matters, telling her what he would do to a certain spot on her body that would make a girl go crazy. He again discussed where she lived; told her he liked her and would love to show her things. At the close of the communication, defendant told Cindy to dream of him. The evidence, and reasonable inferences from the evidence, was sufficient for a jury to find beyond a reasonable doubt that on April 8, 2004, defendant's purpose in communicating with Cindy was to entice her, believing her to be less than 15 years old, to meet him for purposes of engaging in sexual conduct, and that his communication was a substantial step toward commission of that offense.

On April 18 defendant had an instant messaging session with Cindy. He told her he had been shopping at Joplin and bought a necklace. He told her he did not have a girlfriend; that he was single. Defendant said he had passed the highway exit that would lead to her house. He then turned the communication to sexual activity using detailed descriptions. After describing sexual acts, he told her to think about them; that they were things he wanted to do. This evidence, and the reasonable inferences that may be derived from it, considered in light of the background from other communications, was sufficient to permit a jury to find beyond a reasonable doubt that on April 18, 2004, defendant's purpose in communicating with Cindy was to entice her, believing her to be less than 15 years old, to meet him for purposes of engaging in sexual conduct, and that his communication was a substantial step toward commission of that offense.

Defendant sent more messages to Cindy. They exchanged emails and on April 24, they participated in another instant messaging communication. Defendant discussed the closeness of the Carver memorial to Cindy's house; said it might work for them to meet there and would not be far for Cindy to walk. He told her the type of vehicle he drove, a green SUV. There was sufficient evidence, together with reasonable inferences that could be gleaned from the evidence, from which a jury could find beyond a reasonable doubt that on April 24, 2004, defendant's purpose in communicating with Cindy was to entice her, believing her to be less than 15 years old, to meet him for purposes of engaging in sexual conduct, and that his communication was a substantial step toward commission of that offense.

Defendant's actions constituted a series of offenses. He made numerous attempts to entice Cindy for purposes of engaging in sexual conduct. As such, the state did not improperly split a single crime for multiple prosecutions. As in State v. Foster, supra, where separate photographs of the same child were deemed sufficient to support individual charges of child pornography, the separate communications and inducements undertaken by defendant to attempt to entice Cindy to engage in sexual conduct were separate acts that constituted separate offenses.

Defendant's third argument in Point I that his acquittal of one count at his first trial barred trial of the offenses for which he was found guilty in the second trial fails for the reasons discussed above. The particular communications in which defendant participated were separate actions. They were not part of the communication for which defendant was acquitted at the first trial. They provided evidence that supported the separate charges on which defendant was found guilty. Point I is denied.

■ Point II contends that the trial court erred by not holding that prosecution for the offense alleged to have occurred on April 24, 2004, at the second trial, was barred by double jeopardy "when the defendant had previously been prosecuted for attempting to entice the same child, on the same date, and in the same way, at a previous trial and these charges were dismissed by the court at the close of state's evidence."

The original information on which defendant was tried at the first trial alleged eleven counts of attempting to entice a child. Two counts, IX and X, alleged offenses that occurred on April 24, 2004. One count was based on an offline message defendant sent Cindy that date. The other was based on an instant messaging communication that occurred the same date. The trial court concluded that the first message was not sufficient to support the offense charged and dismissed Count IX. The remaining count that was directed to an occurrence on April 24, Count X, was submitted to the jury and resulted in mistrial. That offense was included in the

amended information that stated the charges tried at the second trial. Defendant was found guilty of that offense.

■ Double jeopardy did not preclude defendant from being tried for the offense that the amended information alleged as having occurred on or about April 24, 2004, for the reason that the offense charged was one of the offenses for which mistrial was declared at the first trial. There was no final verdict of acquittal of that offense at the first trial. "Double jeopardy only attaches when there is a final verdict of acquittal. [*State v. Peters*, 855 S.W.2d 345] at 349–50 [ (Mo.banc 1993), *cert. denied*, 510 U.S. 1075, 114 S.Ct. 887, 127 L.Ed.2d 81 (1994) ]. It does not prevent a new trial in the case … when a mistrial is declared because of a hung jury." *State v. Zimmerman*, 941 S.W.2d 821, 826 (Mo. App.1997). Point II is denied.

■ Point III, although not in the form that Rule 84.04(d)(1) directs [5], complains that the evidence was not sufficient to convict defendant of seven counts of attempted enticement of a child; that the convictions were against the great weight of the evidence, "in that talk alone is insufficient to find an attempt and where [defendant] never solicited sexual contact from the individual pretending to be a child." The answer to defendant's claims in Point III are found in the language in §§ 564.011.2 and 566.151.2 and in the determination made in Point I. Section 564.011.2 states:

It is no defense to a prosecution under this section that the offense attempted was, under the actual attendant circumstances, factually or legally impossible of

5. A technically deficient point may be dismissed for lack of compliance with Rule 84.04(d); however, appellate court policy is to decide cases on their merits rather than on technical deficiencies in the brief. Unless a defective point impedes disposition on the

merits, appellate courts generally exercise their discretion to determine the issue presented on the merits. *See Wilkerson v. Prelutsky*, 943 S.W.2d 643, 647 (Mo.banc 1997). As Point III does not impede disposition on the merits, it will be reviewed.

commission, if such offense could have been committed had the attendant circumstances been as the actor believed them to be.

Section 566.151.2 states:

It is not an affirmative defense to a prosecution for a violation of this section that the other person was a peace officer masquerading as a minor.

The evidence discussed in Point I, and which is set out in greater detail in the facts that are recited elsewhere, considered in conjunction with the provisions of §§ 564.011 and 566.151, was sufficient for a jury to have found defendant guilty of the offenses for which he was convicted. Point III is denied. The judgment is affirmed.

RAHMEYER, P.J., and T. SCOTT, Sr.J., concur.