

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED111626 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Stanley J. Wallach |
| ANTHONY TATE, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 28, 2024 |

## Introduction

Anthony Tate ("Tate") appeals from the trial court's judgment following jury convictions on first-degree murder, two counts of first-degree assault, unlawful use of a weapon, unlawful possession of a weapon, and four associated counts of armed criminal action ("ACA") arising out of a drive-by shooting in a parking lot. Tate raises four points on appeal. Points One and Two assert the trial court erred in overruling Tate's motion for acquittal on the counts of first-degree assault against M.E. and A.H., respectively, because the State adduced insufficient evidence that Tate caused either victim serious physical injury. Points Three and Four raise unpreserved claims of plain error. Point Three contends the trial court plainly erred in not intervening sua sponte when the State made an improper acquittal-first closing argument. Point Four claims the trial court plainly erred in failing to strike sua sponte a detective's hearsay testimony because it went to the ultimate issue of whether Tate was involved in the shooting. Because the State failed to present to the jury sufficient evidence from which it reasonably could

find that M.E. and A.H. suffered serious physical injury, we grant Points One and Two. Because Tate has not demonstrated manifest injustice from either allegation of plain error, we deny Points Three and Four. Accordingly, we affirm the trial court's judgment in part, and we reverse and remand in part for further proceedings consistent with this opinion.

Factual and Procedural History

The following facts are limited to only those necessary to resolve the appeal and are presented in the light favorable to the jury verdicts.[1] On December 12, 2019, Tate drove a silver Ford Edge SUV ("Ford Edge') into a barbershop parking lot, where he waited twenty-three minutes until he could pull beside another car parked in the lot. Then, acting either alone or with an accomplice, Tate fired fifteen shots into the other car, killing T.S. and injuring M.E. and A.H.

After being shot, T.S., M.E., and A.H. ran to the barbershop. T.S. died at the scene after bleeding out on the pavement from his gunshot wounds. A.H. was shot in the leg. M.E. was shot in the left thigh and left hand. When police arrived, M.E. was standing on the sidewalk, then he sat on the ground and allowed an officer to begin treating his gunshot wounds. A.H. had been walking around inside the barbershop, then either lay or collapsed on the ground in the doorway when police arrived. A.H. stood up with the help of a police officer and limped a few steps before sitting down on the sidewalk. A police officer cut A.H.'s pants from the bottom to expose and treat the wound, where the bullet was visibly lodged under his knee. Paramedics arrived, placed both Victims on stretchers, and took them to the hospital by ambulance.

After the shooting, Tate drove the vehicle to a nearby gas station, where surveillance video footage showed him wearing distinctive clothing and having a tattoo or discoloration on his left hand. Approximately, two weeks after the shooting, Tate fled police during a traffic stop

---

[1] See State v. Johnson, 284 S.W.3d 561, 568 (Mo. banc 2009) (internal citation omitted).

2

while he was driving the Ford Edge. Tate abandoned the vehicle and ran into the basement of a house belonging to people he did not know. The police followed and arrested Tate, recovering a backpack containing the gun used in the shooting as confirmed by bullet ballistics. Tate had previously made social media posts of himself holding the gun. Tate spoke with police officers when he was arrested. A recording of his police station interview was admitted into the record but was not played for the jury.

The State charged Tate with first-degree murder of T.S., first-degree assault against Victims M.E. and A.H., unlawful use of a weapon, unlawful possession of a weapon, as well as four counts of ACA.[2] At trial, the State introduced evidence of M.E. and A.H.'s injuries through surveillance video footage of the shooting, hospital photographs of Victims' bandaged injuries, and the testimony of Detective D.S., who spoke with Victims in the hospital's emergency trauma department. Detective D.S. testified that the Victims' injuries were consistent with the doctor's diagnoses of gunshot wounds. The State then moved to have Victims' 100–150-page hospital records admitted into evidence, which the trial court granted with no objection from the defense. The State published to the jury only one page from each Victim's hospital records. The one published page for each Victim stated the diagnoses of gunshot wound, the arrival and discharge time for each Victim, and the stable medical condition of each Victim upon discharge. In closing argument, the State argued to the jury that it had proved Tate caused M.E. and A.H. serious physical injury because they were shot. During deliberations, the jury did not request to review M.E. or A.H.'s medical records.

Throughout trial, Tate's theory of defense was misidentification. Tate testified in his own defense and said that he did not know the Victims and did not shoot them. Tate admitted

---

[2] The State also charged Tate with first-degree assault and ACA against a fourth victim, M.M., alleging that Tate also opened fire on M.M.'s car. The jury acquitted Tate on these charges, and they are not before us on appeal.

3

driving the Ford Edge on a later date and fleeing police officers who attempted to detain him, but he denied driving the Ford Edge during the shooting.

Detective J.P. testified that cellphone records placed Tate near the shooting's location. Tate admitted it was his phone but stated it was a shared phone used for selling marijuana illegally and he did not have it on the day of the shooting. Prior to Detective J.P. taking the stand, the parties agreed not to elicit information about whether the State filed charges against C.M., Tate's cousin, whom the State also investigated. Detective J.P opined that his investigation of C.M. implicated Tate because C.M. was an associate of Tate's and because both men's cellphone records placed them near the shooting. Tate did not object to Detective J.P.'s testimony. Tate cross-examined Detective J.P. about the investigation of C.M., eliciting that C.M. had the same distinctive outfit Tate wore on the night of the shooting. Tate implied the State may have misidentified him for C.M. Tate testified that C.M. was his cousin and that he was near C.M.'s house at the time of the shooting.

In closing, the State argued to the jury that it met its burden to prove beyond a reasonable doubt that Tate committed first-degree murder against T.S. by firing fifteen rounds into an occupied vehicle. The State acknowledged Tate's defense of misidentification but argued it proved that Tate was driving the vehicle from which the shots were fired. The State further argued that it did not have to prove that Tate pulled the trigger due to accomplice liability law. Regarding the deliberation element, the State argued the video surveillance footage showed twenty-three minutes of deliberation. Specifically, the Ford Edge arrived at the parking lot and lay in wait for twenty-three minutes before shots were fired from the passenger-side window.

The State next discussed the lesser-included offenses, saying:

Now I'll touch briefly on some of these what we call lesser included. And you'll see at the top, you don't get here *unless you find him not guilty of murder in the*

4

***first degree.*** You review this, you find him guilty, you're done. You don't continue on.

(Emphasis added). The State also said: "You can consider murder in the second degree ***only if you find that he's not guilty of murder in the first degree***." (Emphasis added). The defense closing argument maintained that the State misidentified Tate and failed to prove beyond a reasonable doubt that Tate was in the Ford Edge on the night of the shooting.

The jury convicted Tate on first-degree murder, first-degree assault of M.E., first-degree assault of A.H., unlawful use of a weapon, unlawful possession of a weapon, and four associated counts of armed criminal action. The trial court sentenced Tate to life in prison without the possibility of parole for first-degree murder, fifteen years for each class A felony of first-degree assault, fifteen years for unlawful use of a weapon, and seven years for unlawful possession, with the sentences to run concurrently. The trial court also sentenced Tate to fifteen years in prison for each ACA count, with those sentences to run concurrently to one another but consecutively to the other sentences. Tate now appeals.

Points on Appeal

Tate raises four points on appeal. Points One and Two argue the trial court erred in overruling Tate's motion for judgment of acquittal on the class A felonies of first-degree assault against M.E. and A.H., respectively, because the State adduced insufficient evidence that Tate caused M.E. or A.H. serious physical injury. Point Three contends the trial court plainly erred in failing to intervene sua sponte when the State made an improper acquittal-first closing argument. Point Four claims the trial court plainly erred in sua sponte failing to strike Detective J.P's testimony that his investigation of C.M. implicated Tate in the shooting because the evidence was inadmissible hearsay that went to the ultimate issue the jury was to decide of whether Tate was involved in the shooting.

5

**I.**     **Points One and Two—Insufficient Evidence of Serious Physical Injury**

A.     Standard of Review

We review a challenge to the sufficiency of the evidence for whether there was "evidence from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt." State v. Johnson, 685 S.W.3d 41, 45 (Mo. App. E.D. 2024) (citing State v. Madrigal, 652 S.W.3d 758, 766 (Mo. App. E.D. 2022)). "We view the evidence and all reasonable inferences in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict." Id. (quoting Madrigal, 652 S.W.3d at 766). However, we "may not supply missing evidence, or give the [State] the benefit of unreasonable, speculative or forced inferences." State v. Clark, 490 S.W.3d 704, 707 (Mo. banc 2016) (quoting State v. Whalen, 49 S.W.3d 181, 184 (Mo. banc 2001)).

B.     Analysis

To sustain Tate's convictions on the class A felonies of first-degree assault under Section 565.050,[3] the State needed to adduce sufficient evidence from which the jury reasonably could have found that Victims M.E. and A.H. suffered serious physical injury. See id. (internal quotation omitted). The State may prove serious physical injury under any one of the following three categories: (1) physical injury that creates a substantial risk of death; (2) physical injury that causes serious disfigurement; or (3) physical injury that causes protracted loss or impairment of the function of any part of the body. Section 556.061(44); Madrigal, 652 S.W.3d at 766 (quoting State v. Carpenter, 592 S.W.3d 801, 805 (Mo. App. S.D. 2019)).

_____

[3] All Section references are to RSMo (2016), unless otherwise noted.

Relevant to this appeal, Missouri courts have held that the mere fact that the victim suffered a gunshot injury is insufficient to prove serious physical injury. See, e.g., State v. Baker, 859 S.W.2d 805, 813 (Mo. App. E.D. 1993). The law in Missouri is consistent with other states which hold that a gunshot wound is *not per se* a serious physical injury. See, e.g., Covington v. United States, 278 A.3d 90, 95–96 (D.C. 2022); State v. Farmer, 380 S.W.3d 96, 102 (Tenn. 2012) (internal citations omitted) (noting courts from numerous other jurisdictions have held similarly). In Baker, this Court reviewed the sufficiency of the evidence of serious physical injury for first-degree assault convictions involving two victims who suffered gunshot wounds. 859 S.W.2d at 811. In that case, the two shooting victims testified at the trial, which was held eleven months after the shooting. Id. at 813. This Court found sufficient evidence of serious physical injury under the protracted-impairment category for the first victim, who was shot in the shoulder and who testified that he continued to experience stiffness in his shoulder. We held that such testimony supported a reasonable inference that continuing stiffness nearly one year after the shooting constituted protracted impairment of the shoulder's function. Id. However, we found insufficient evidence to support a finding of serious physical injury under the protracted-impairment category for the second victim, who was shot in the leg. The second victim testified only that he experienced aches in his legs when it was cold or rainy. Because this testimony did not implicate any problems with the function of the leg to ambulate or support second victim while standing, we found that the second victim's testimony did not support a finding of protracted impairment. Id.

More recently, this Court considered the sufficiency of the evidence to support a finding of serious physical injury from a gunshot wound for first-degree assault under the category of substantial risk of death. Johnson, 685 S.W.3d at 45. In Johnson we noted the long-standing

7

proposition that a victim's survival of an assault due to medical treatment does not negate the evidence that his injury ***could*** have been life-threatening. Id. (citing State v. Kruger, 926 S.W.2d 486, 488 (Mo. App. E.D. 1996)). There, we found sufficient evidence that the gunshot wound inflicted by the defendant created a substantial risk of death to victim where the jury heard evidence that the gunshot wound to the victim's forearm caused significant bleeding and low blood pressure which, if left untreated, could have led the victim to bleed to death or die from hypotension. Id.

Here, it is undisputed from the evidence at trial that both M.E. and A.H. suffered gunshot wounds. It is also undisputed that M.E. and A.H. were taken by ambulance to a hospital for treatment. On appeal, the State argues in its brief that it met its burden of proving that M.E. and A.H. each sustained serious physical injuries because each suffered protracted impairment of their bodily functions as a result of the gunshot wounds. However, in so arguing, the State relies on evidence that the State possessed but ***did not present to the jury.*** We cannot consider such evidence on appeal. See Johnson, 685 S.W.3d at 45 (citing Madrigal, 652 S.W.3d at 766); see also Clark, 490 S.W.3d at 707 (quoting Whalen, 49 S.W.3d at 184).

We look at the following evidence that was presented to the jury in the light favorable to the State, which includes: the video surveillance footage which depicts the shooting, the Victims immediately following the shooting, and the arrival of the police officers and paramedics; the testimony of Detective D.S., who spoke with Victims at the hospital; the photographs of Victim's bandaged injuries taken at the hospital; and the published page from the hospital records of each Victim, indicating Victims' diagnoses and arrival and discharge times.

This evidence shows that M.E. was shot in his left thigh and in his hand. M.E. was standing on the sidewalk outside the barbershop when police arrived. M.E. sat down and let a

8

police officer treat his hand and leg while waiting for paramedics, who transported him to the hospital by ambulance. M.E. was diagnosed with gunshot wounds to his thigh and hand and was discharged in stable condition after approximately six hours.

A.H. was shot in the leg. A.H. retreated into the barbershop, where he was walking until police arrived, at which point he sat down on a chair, then fell or lay on the ground in the doorway. A.H. limped outside and sat down again, where he allowed the police officer to cut his pants to treat his wound. A bullet was visibly lodged in his leg under his knee. Paramedics arrived and took him to the hospital by ambulance. A.H. was diagnosed with a gunshot wound to his left lower leg and was discharged in stable condition after approximately three hours. The jury was presented with no evidence that either Victim suffered a protracted impairment of any bodily function as a result of their gunshot wounds.

The record does not support a finding that the State met its burden of presenting evidence from which the jury reasonably could find Victims suffered serious physical injury for the purposes of the class A felony of first-degree assault under the protracted-impairment category. See Sections 556.061(44), 565.050; Madrigal, 652 S.W.3d at 766 (quoting Carpenter, 592 S.W.3d at 805). "Proof that a deadly weapon was fired at the victim, wounding him, is enough evidence for a jury to find the *class B felony* of assault in the first degree." State v. Nguyen, 880 S.W.2d 627, 635 (Mo. App. W.D. 1994), *overruled on other grounds by* State v. Driver, 912 S.W.2d 52 (Mo. banc 1995) (emphasis added). However, "[t]o raise the offense from a class B felony to a class A felony, there must be additional proof that serious physical injury was actually inflicted[.]" Id. (internal citation omitted). "In Nguyen, the only supporting factual basis for serious physical injury was the jewelry store owner's observation that the [shooting] victim was taken to the hospital 'in critical [condition],' in an apparent attempt to describe the

9

serious condition of his injury." State v. Westerman, 971 S.W.2d 932, 933 (Mo. App. W.D. 1998) (quoting Nguyen, 881 S.W.2d at 631). Because the State did not offer any further testimony or evidence establishing the victim's condition, other than being shot and taken to the hospital "in critical [condition]," there was insufficient evidence to find serious physical injury. Compare id. (citing Nguyen, 881 S.W.2d at 631) with State v. Goodson, 943 S.W.2d 239, 241 (Mo. App. E.D. 1997) (distinguishing from Nguyen because, in addition to the police officer's testimony, the shooting victim's medical records were read into evidence, which contained enough information about her six-day hospital treatment and surgery to show that she sustained life-threatening injuries).

We note that the State does not argue that Tate caused serious physical injury to Victims because the gunshot wounds inflicted on M.E. and A.H. created a substantial risk of death. However, we consider that statutory alternative given our standard of review. See Johnson, 685 S.W.3d at 45 (quoting Madrigal, 652 S.W.3d at 766). Similar to Nguyen, Detective D.S. testified that Victims were being treated in the trauma department and had gunshot injuries consistent with the doctor's diagnoses of gunshot wounds, as indicated on the pages from Victims' medical records published to the jury. But such evidence, without more, is insufficient to meet the State's burden under the substantial-risk-of-death category of Section 556.061(44). See Westerman, 971 S.W.2d at 933 (citing Nguyen, 881 S.W.2d at 631).

We are troubled by the fact that although the State submitted Victims' medical records into the evidentiary record, it did not present them to the jury through either witness testimony or other means. The State had each of Victim's medical records admitted (approximately 100 pages for A.H. and 150 pages for M.E.). Evidence within those medical records was relevant to the issue of serious physical injury. But, critically, admitting a piece of evidence into the record

10

*is not equivalent to publishing such evidence*.  Cf. Damon Pursell Constr. Co. v. Mo. Highway & Transp. Comm'n, 192 S.W.3d 461, 469–70 (Mo. App. W.D. 2006).  Here, the sole testimony the State elicited from Detective D.S. about Victims' injuries was that they suffered gunshot wounds.  The State presented the jury with no testimony regarding either the severity of the injuries caused by the gunshot wounds or any evidence of protracted impairment of bodily functions caused by Victims' injuries.  The record shows that the State published to the jury only one page from each Victim's medical records.  That page simply indicated the diagnoses of gunshot wounds along with the Victims' arrival and discharge timestamps.

Upon the close of evidence, a jury is not permitted to take all admitted evidence into the room during deliberations.  See State v. Fields, 675 S.W.3d 562, 571 (Mo. App. E.D. 2023) (quoting State v. Barnett, 980 S.W.2d 297, 308 (Mo. banc 1998)).  Instead, during its deliberations a jury may request to review documents admitted into evidence as exhibits.  When a jury makes such a request, "[t]he decision to send an exhibit to the jury room during deliberations lies within the sound discretion of the trial court."  Id. (quoting Barnett, 980 S.W.2d at 308); see also State v. Driskill, 459 S.W.3d 412, 430 (Mo. banc 2015) (internal quotation omitted) ("Even where an exhibit is properly admitted into evidence, the decision whether the exhibit should be sent back to the jury during deliberations remains a matter within the sound discretion of the trial court.").

In this case, during its deliberations, the jury requested to review some of the exhibits admitted into evidence, including the surveillance videos, Tate's police station interview, the social media posts, and the bullet ballistics.  The trial court conferred with the parties and ruled that the jury could be sent *some* of the requested evidence.  Notably, the trial court declined to send the police station interview because "even though introduced and received, [the disc] was

11

never played, and so the Court is going to advise the jury that they will not be able to watch that." The trial court's ruling illustrates the important principle that the State must do more than simply *submit* evidence into the record; the State must *present* the evidence to the jury during the trial. See Damon Pursell Constr., 192 S.W.3d at 467 (noting the trial court denied the jury's request to view a certain exhibit during deliberations due to concerns that, without expert testimony to explain the significance of the evidence, the jury would misinterpret the evidence's meaning or importance); see also State v. Kunonga, 490 S.W.3d 746, 758 (Mo. App. W.D. 2016) (reviewing only the evidence actually heard by the jury in holding that the trial court did not abuse its discretion in not declaring a mistrial where the State admitted a video in its entirety, began playing it for the jury, but stopped the video before the inadmissible portion). Just as the State here chose not to play the police station interview for the jury, and the trial court appropriately exercised its discretion not to send that video back to the jury during deliberations, the State chose not to present the details of Victims' medical records, thus those details were not before the jury for consideration. Nor are these records before us for appellate review of this claim. Because the jury did not rely on that evidence to reach its verdicts, we cannot rely on it now. See Clark, 490 S.W.3d at 707 (quoting Whalen, 49 S.W.3d at 184).

As Baker established, Missouri law requires more than the fact of a gunshot wound to an extremity to establish serious physical injury. 859 S.W.2d at 813. How much more? The bar is neither high nor difficult to meet. Stiffness impacting the function of a body part is sufficient to show protracted impairment. Id. Being unable to walk without the aid of crutches for one week is sufficient to show protracted impairment. State v. Ross, 939 S.W.2d 15, 18–19 (Mo. App. S.D. 1997). Continuing pain and arthritis from being shot in the leg is sufficient to show protracted impairment. State v. Lanier, 985 S.W.2d 377, 380 (Mo. App. E.D. 1999). Significant

12

blood loss and low blood pressure together are sufficient to show a substantial risk of death. Johnson, 685 S.W.3d at 45. A gunshot wound at "relatively close range" to the neck is sufficient to show a substantial risk of death. State v. Duley, 219 S.W.3d 842, 845 (Mo. App. W.D. 2007). The record before us—particularly, the record before the jury during this trial—fails to meet even this low threshold. On appeal, the State maintains it met its burden of proving serious physical injury on both assault charges under the protracted-impairment category of Section 556.061(44). But the State simply presented the jury with insufficient evidence regarding Victims' treatment or recoveries from which a jury reasonably could find the Victims suffered a protracted impairment of any bodily function. See Ross, 939 S.W.2d at 18 (internal citation omitted) (explaining protracted impairment is concerned with the temporal aspect of the injury). Although not argued by the State on appeal, we also analyzed whether the evidence actually presented to the jury reasonably could support a finding that the gunshot wounds inflicted by Tate created a substantial risk of death to Victims. The videos, photos, police testimony, and limited medical records seen by the jury do not show any profuse bleeding or unconsciousness, difficulty in breathing, or gunshot wounds to the chest or other obvious vital organ areas. The only medical records seen by the jury indicated that both Victims were treated and released from the hospital in stable condition that same night. See Johnson, 685 S.W.3d at 45. This evidence does not meet the State's burden of proving serious physical injury to sustain the convictions of assault in the first degree as a class A felony. See Section 565.050.

In granting Points One and Two, we vacate only the elevation of the felony class of the first-degree assault Counts V and VII. "A person commits the offense of assault in the first degree if he or she attempts to kill or knowingly causes or *attempts to cause serious physical injury* to another person." Section 565.050.1 (emphasis added); see also Whalen, 49 S.W.3d at

13

186. "The offense of assault in the first degree is a class B felony unless in the course thereof the person inflicts serious physical injury on the victim . . . in which case it is a class A felony." Section 565.050.2. In other words, in order "[t]o elevate the assault charges to a class A felony the State was required to prove that the victims actually suffered 'serious physical injury.'" Ross, 939 S.W.2d at 17 (quoting Section 565.050.2). Here, the jury found Tate guilty of the class A felonies of first-degree assault, and the only issue before us is the State's failure to present the jury with sufficient evidence of serious physical injury, therefore Tate is entitled only to a change in the felony class. See id. (quoting Section 565.050.2); see also State v. Dooley, 919 S.W.2d 539, 542 (Mo. App. E.D. 1995) (internal citation omitted).

Accordingly, we reverse the class A felony convictions for first-degree assault on Counts V and VII and enter class B felony convictions for first-degree assault on Counts V and VII. We remand to the trial court for resentencing.

## II. Points Three and Four—No Plain Error

In Points Three and Four, Tate alleges the trial court committed plain error in failing to intervene sua sponte during the State's closing argument and in the admission of Detective J.P.'s hearsay statements. Because Tate did not object at trial, the issues are not preserved, and he requests plain-error review.

### A. Standard of Review

Rule 30.20[4] gives us discretion to review unpreserved "plain errors affecting substantial rights . . . when the [C]ourt finds that manifest injustice or miscarriage of justice has resulted therefrom." State v. Brandolese, 601 S.W.3d 519, 526 (Mo. banc 2020) (quoting Rule 30.20). As a threshold matter, we "will not review a claim for plain error unless the claimed error

---

[4] All Rule references are to Mo. R. Crim. P. (2024).

14

'facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted.'" Id. (quoting State v. Clay, 533 S.W.3d 710, 714 (Mo. banc 2017)). Then, if plain-error review is warranted, to obtain relief the appellant must satisfy a two-part test establishing: (1) trial court error that is "evident, obvious, and clear" and (2) "manifest injustice or miscarriage of justice" resulting from the error. State v. Johnson, 599 S.W.3d 222, 226 (Mo. App. W.D. 2020) (quoting State v. Wood, 580 S.W.3d 566, 579 (Mo. banc 2019)).

To prevail on a claim of plain error, "the appellant must show 'the error was outcome determinative.'" State v. Foster, 674 S.W.3d 119, 123 (Mo. App. E.D. 2023) (quoting Johnson, 599 S.W.3d at 226). "Even if the State's argument is deemed improper, 'reversal is warranted only if the defendant shows the improper argument "had a decisive effect on the jury's determination."'" Id. at 124 (quoting Johnson, 599 S.W.3d at 227 (quoting Wood, 580 S.W.3d at 569)).

B.      Analysis

1.      **Point Three—No Manifest Injustice During State's Closing Argument**

"Missouri's instructions on lesser-included offenses do not require that the defendant first be acquitted of the greater offense before the jury can consider the lesser offense." Johnson, 599 S.W.3d at 226 (quoting Tisius v. State, 183 S.W.3d 207, 217 (Mo. banc 2006)). Instead, Missouri law provides that "a jury *may* consider lesser-included offenses *if* it does not find the defendant guilty of the greater offense." Foster, 674 S.W.3d at 124 (citing Johnson, 599 S.W.3d at 226). Therefore, the State misstates the law if it argues to a jury that a defendant must first be found not guilty of the greater offense before the jury can consider lesser-included offenses. Id. (citing Johnson, 599 S.W.3d at 226). "Telling a jury [it] must first find a defendant not guilty of a greater offense before lesser-included offense instructions can be reached is plainly an improper acquittal-first argument." Id. (quoting Johnson, 599 S.W.3d at 232 n.5).

15

Here, after arguing how it proved each element of first-degree murder, the State reviewed the lesser-included offense instructions with the jury, saying: "you don't get here unless you find him not guilty of murder in the first degree" and "[y]ou can consider murder in the second degree only if you find that he's not guilty of murder in the first degree." The State concedes these statements violate the prohibition against acquittal-first arguments, and we agree. See id. (quoting Johnson, 559 S.W.3d at 226). However, "[t]his [C]ourt 'rarely finds plain error in closing argument, and reversal is warranted only if the defendant shows the improper argument 'had a decisive effect on the jury's determination.'" Johnson, 599 S.W.3d at 227 (quoting Wood, 580 S.W.3d at 579). Plain error in closing is rarely granted "because the 'absence of an objection and request for relief during closing arguments mean that any intervention by the trial court would have been uninvited and may have caused increased error.'" Id. (quoting State v. Perry, 275 S.W.3d 237, 245 (Mo. banc 2009)).

Johnson is squarely on point. Johnson found the State misstated the law when it told the jury it could consider lesser-included offenses "only . . . if you find [the defendant] is not guilty of murder first degree." Id. at 226. However, Johnson found the trial court's failure to intervene sua sponte and issue a curative instruction did not rise to the level of plain error resulting in manifest injustice given the full context of the arguments at trial, "particularly in light of [the defendant's] trial strategy which did not focus on the degree of Johnson's criminal culpability, and instead focused on whether Johnson had been misidentified as the shooter." Id. at 227. Similarly, here, we must view the challenged statements in their full context. Foster, 674 S.W.3d at 125 (internal citation omitted). In closing argument, the State only briefly mentioned the lesser-included offenses. Tate did not mention the lesser-included offenses whatsoever in closing argument, instead arguing that the State was putting the wrong man on trial. See

16

Johnson, 599 S.W.3d at 227 (quoting Perry, 275 S.W.3d at 245) (noting a defendant's lack of objection to an improper closing argument "is often strategic in nature, and the taking of uninvited action by the court in such a case simply may emphasize the matter in a way defendant chose not to do"). Here, the State in its closing argument almost exclusively focused on the evidence of first-degree murder. Correspondingly, Tate's defense strategy was misidentification, and the trial turned on whether the jury believed Tate was driving the Ford Edge during the shooting. The parties presented no argument to the jury about lack of deliberation or that the homicide amounted to any lesser-degree offense than first-degree murder. Therefore, as in Johnson, we are not persuaded that the trial court's failure to interrupt the State's closing argument to issue a curative instruction had a decisive effect on the jury verdict. See id. Additionally, there is no claim of instructional error on those counts, and we presume the jury follows the trial court's correct instructions. See Tisius, 183 S.W.3d at 217 (internal citation omitted). Accordingly, because Tate did not demonstrate manifest injustice, he is not entitled to plain-error relief. See Johnson, 599 S.W.3d at 227 (quoting Wood, 580 S.W.3d at 579). Point Three is denied.

### 2. Point Four—No Manifest Injustice from Admission of Detective's Testimony

In Point Four, Tate contends that Detective J.P.'s statements that the investigation of C.M. implicated Tate in the shooting were inadmissible hearsay. Tate acknowledges that he did not object to the statements at trial, and he argues on appeal that the trial court's failure to intervene sua sponte and instruct the jury to disregard the statements amounted to plain error.

"Uninvited interference by the trial judge in trial proceedings is generally discouraged, as it risks injecting the judge into the role of a participant and invites trial error." Kunonga, 490 S.W.3d at 755 (internal quotation omitted). "Thus, we will rarely find plain error where a trial

17

court has failed to take sua sponte action with regard to the proceedings." Id. (internal quotation omitted).

On appeal, Tate relies on State v. Hollowell, 643 S.W.3d 329 (Mo. banc 2022), to argue that Detective J.P.'s testimony prejudiced the outcome of his trial because the State had no other direct evidence placing Tate at the shooting. 643 S.W.3d at 338–39 (finding the trial court's overruling of the defendant's objection to hearsay evidence was prejudicial where it was the only direct evidence of the ultimate factual issue). Tate, however, must do more than show prejudice. See State v. Polson, 145 S.W.3d 881, 890 (Mo. App. W.D. 2004) (internal quotation omitted) (noting the manifest-injustice standard for plain error requires "[m]ore than a mere showing of demonstrable prejudice"). Even assuming, without deciding, that any of the Detective J.P.'s statements in the broadly cited record were inadmissible hearsay, Tate must prove a reasonable probability that the jury's verdict would have been different but for the inadmissible evidence, not merely that the evidence contributed to the jury's verdict. See Kunonga, 490 S.W.3d at 756–57 (internal quotation omitted) (finding no manifest injustice from the trial court's failure to intervene sua sponte in the admission of alleged hearsay testimony).

Prior to trial, the parties agreed not to elicit information about whether the State filed charges against C.M. In the testimony at issue, Detective J.P. testified that his investigation of C.M. implicated Tate because C.M. was an associate of Tate's. Detective J.P. stated that his investigation of the shooting established that Tate was associated with C.M., that C.M.'s phone records placed C.M. near the shooting, and that Tate's phone records also placed Tate near the shooting. We find that Tate has not shown manifest injustice given his defense strategy to admit his association with C.M. and to suggest to the jury that C.M. was mistaken for him. See id. Rather than objecting to Detective J.P's testimony, Tate used and further elicited such evidence

to support his misidentification and alibi defenses, specifically highlighting that C.M. was Tate's cousin, that C.M. had the same distinctive outfit Tate wore on the night of the shooting, and that Tate was near C.M.'s house at the time of the shooting. Detective J.P. testified that in his opinion C.M.'s involvement enhanced rather than dispelled suspicion of Tate's involvement in the shooting. Given that both parties elicited evidence about Detective J.P.'s investigation of C.M. and used the evidence to make their arguments to the jury about whether or not Tate was involved in the shooting, the record does not present "the most unusual and exceptional circumstances" warranting trial court interference absent objection by the defendant. See id. at 755 (internal quotation omitted). Tate has not shown the requisite manifest injustice or a miscarriage of justice necessary to reverse for plain error. See Johnson, 599 S.W.3d at 226 (quoting Wood, 580 S.W.3d at 579). Point Four is denied.

Conclusion

The judgment of the trial court is affirmed in part and reversed in part. We reverse the class A felony convictions for first-degree assault on Counts V and VII, and we enter class B felony convictions for first-degree assault on Counts V and VII. The trial court's judgment is affirmed in all other respects. We remand for resentencing consistent with this opinion.

_____
KURT S. ODENWALD, Presiding Judge

Michael E. Gardner, J., concurs.
Renée D. Hardin-Tammons, J., concurs.